Lawrence J. Moran, Jr., Esq.
Jennifer Menichini, Esq.
**JOYCE, CARMODY & MORAN, P.C.**
9 N. Main St., Suite 4
Pittston, PA 18640
Ph: (570)602-3560
Fax: (570)602-3561
Email:    ljm@joycecarmody.com                    Attorneys for Plaintiff, Virginia Flynn
          jm@joycecarmody.com

| UNITED STATES DISTRICT COURT MIDDLE DISTRICT OF PENNSYLVANIA | |
|---|---|
| **VIRGINIA FLYNN,**<br><br>                    **Plaintiff,**<br>    **v.**<br><br>**CITY OF SCRANTON,**<br>**MAYOR PAIGE COGNETTI,**<br>**individually, and**<br>**LOCAL LODGE NO. 2462, THE**<br>**INTERNATIONAL ASSOCIATION**<br>**OF MACHINISTS AND**<br>**AEROSPACE WORKERS, AFL-**<br>**CIO,**<br><br>                    **Defendants.** | **CIVIL ACTION - LAW**<br>**JURY TRIAL DEMANDED**<br><br><br>**No.** |

## COMPLAINT

AND NOW Comes Plaintiff, Virginia Flynn ("Plaintiff" or "Mrs. Flynn"), by and through her undersigned counsel, and files this Complaint to complain of a concerted and persistent effort by the City and Mayor Paige Cognetti to discriminate against and retaliate against Mrs. Flynn, to ultimately terminate Mrs. Flynn's employment, and in support thereof alleges discrimination and retaliation in violation of the Americans with Disabilities Act (ADA), as amended, the Age Discrimination in Employment Act (ADEA), Title VII of the Civil Rights Act of 1964, and the Pennsylvania Human Relations Act ("PHRA"), in addition to claims

alleged under 42 U.S.C. §1983 for First Amendment violations in retaliation for Plaintiff's political speech, political association, union activity and union membership in violation of the protections of the First Amendment. Plaintiff also alleges that her union, the Local Lodge No. 2462, the International Association of Machinists and Aerospace Workers, AFL-CIO (hereinafter, the "Union") breached its duty of fair representation, and, generally, in support thereof, states as follows:

## JURISDICTION AND VENUE

1.      This action arises out of violations of Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended by the Civil Rights Act of 1991, 42 U.S.C. §2000e *et seq.,* the Americans with Disabilities Act ("ADA"), as amended, 42 U.S.C.A. §12101 *et seq.,* the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §621 *et seq.,* the Pennsylvania Human Relations Act ("PHRA"), 43 P.S. §955, *et seq.,* and pursuant to 42 U.S.C. §1983 for violations of her constitutional rights, against Defendants, the City of Scranton and Mayor Paige Cognetti for discrimination and retaliation and to vindicate her right to be free from discrimination and retaliation in her working environment, and to protect her rights and freedoms inherent under the First Amendment.

2.      Plaintiff maintains this action to redress acts of discrimination and/or retaliation.

3.    This Court has jurisdiction over this action pursuant to 28 U.S.C.A. §1331 for matters arising under the laws of the United States, and supplemental jurisdiction under 28 U.S.C.A. §1367 for pendent state claims, including Plaintiff's future claims under the PHRA and Plaintiff's claim for breach of the duty of fair representation against the Union.

4.    Venue is proper in this judicial district under 28 U.S.C. §1391(b) because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district and because Plaintiff is a resident of this Commonwealth and this judicial district, the events occurred in this judicial district, Defendant City of Scranton, is a municipal entity located in this judicial district, the individual Defendant is employed by the City of Scranton, and the Union regularly conducts business in the City of Scranton.

5.    All conditions precedent to jurisdiction under the applicable statutes have been met:

a.    Plaintiff timely filed a Charge of Discrimination at EEOC Charge No. 530-2023-04268 (the "Initial Charge") alleging employment discrimination and retaliation with the Equal Employment Opportunity Commission ("EEOC") on March 21, 2023 which was dual-filed with the Pennsylvania Human Relations Commission ("PHRC")[1];

---

[1]    Plaintiff's claims under the PHRA are identified for notice purposes only, as Plaintiff must one (1) year prior to initiating a lawsuit from the date of the dual-filing with the EEOC. Plaintiff, however, has been required to initiate this action prior to the expiration of same because of the date of the issuance of the Dismissal and Notice of Rights by the EEOC. Plaintiff's PHRA claims will mirror her federal claims under

b. The EEOC conducted an investigation of the Plaintiff's Initial Charge of Discrimination;

c. Plaintiff was issued a Dismissal and Notice of Rights by the EEOC dated October 16, 2023, satisfying all administrative requirements, and this action is being filed within ninety (90) days thereof. [A true and correct copy of the Notice of Dismissal is attached hereto as Exhibit A].

d. All other statutory prerequisites to filing the present Complaint have been met.

6.     On December 21, 2023, Complainant filed a Supplemental Charge of Discrimination at EEOC Charge No. 530-2024-02105 ("Supplemental Charge") to include additional facts relating specifically to the termination of Plaintiff's employment on September 21, 2023 which occurred after the EEOC concluded its investigation. The Supplemental Charge remains pending with the EEOC.[2]

---

the ADA, the ADEA and Title VII, and will also include claims against her individual supervisors as permitted by the PHRA. As such, Plaintiff intends to file an Amended Complaint after the one-year period has lapsed to add a count for violations under the PHRA, including claims against individual(s) for aiding and abetting in the ongoing discrimination and retaliation against Plaintiff.

[2] Plaintiff has requested expedited processing of her Charge of Discrimination, but the EEOC will not be able to do so prior to the deadline for the filing of this action. As such, Plaintiff will seek to amend this action or file an additional action within the time periods required following the EEOC's investigation of the subsequent Charge to include a specific count relating to her termination. Plaintiff includes information relating to her termination as such is directly relevant to her claims that the City was trying to find a reason to fire her, and indeed, it ultimately did. Plaintiff also includes information relating to her termination as directly related to her §1983 claims, which do not require exhaustion. Plaintiff, however, will amend her complaint to include a specific claim for the retaliatory termination of her

7.     Plaintiff files this action within the ninety (90) day timeframe required following the issuance of the Dismissal and Notice of Rights with respect to the Initial Charge, and intends on amending this Complaint to include the termination specifically following the issuance of the Notice of Rights from the EEOC on the Supplemental Charge.

## **PARTIES**

8.     The preceding paragraphs are incorporated by reference as though set forth fully herein.

9.     Plaintiff, Virginia Flynn, is an adult woman who currently resides at 1401 Oram Street, Scranton, Lackawanna County, Pennsylvania.

10.    Defendant, City of Scranton, is a political subdivision of the Commonwealth of Pennsylvania and city of the Second Class A with its principal place of business located at 200 North Washington Avenue, Scranton, Lackawanna County, Pennsylvania.

11.    Defendant, Mayor Paige Cognetti, is an adult individual who serves as the duly-elected mayor of the City of Scranton, who maintains her office at 200 North Washington Avenue, Scranton, Lackawanna County, Pennsylvania.

---

employment which is the subject of the Supplemental / Subsequent Charge following the exhaustion of the EEOC administrative process. Plaintiff, however, was required to file this action relating to the Initial Charge within 90 days of the issuance of the Dismissal and Notice of Rights.

12.     Eileen Cipriani, is the current Business Administrator for the City of Scranton and previously was employed as the Director of the Office of Economic and Community Development.

13.     Thomas Oleski, is an adult individual who is currently employed by the City of Scranton as the Director of Code Enforcement.

14.     Mr. Oleski reports to Ms. Cipriani who reports to Defendant Mayor Cognetti.

15.     Defendant, Local Lodge No. 2462, the International Association of Machinists and Aerospace Workers, AFL-CIO, is the local bargaining unit of the International Association of Machinists and Aerospace Workers, AFL-CIO, which is the party to a Collective Bargaining Agreement between the City and the bargaining unit, which included certain positions in the Licensing and Inspections Department, including the Rental Registration Assistant position previously held by Mrs. Flynn.

16.     The Union maintains a principal place of business in Scranton, Pennsylvania and/or regularly conducts business in Scranton, Pennsylvania.

17.     At all times material hereto, Defendant City of Scranton was engaged in an industry affecting commerce and had at least twenty (20) or more employees for each working day in each of twenty (20) or more calendar weeks in the relevant or preceding calendar year.

## **FACTUAL ALLEGATIONS**

18.     The preceding paragraphs are incorporated by reference as though set forth fully herein.

19.     Virginia Flynn is a 67 year-old female who suffers from a disability, including gastrointestinal issues, resulting in gastric bypass surgery, which had been reported to her former employer, the City of Scranton.

20.     Mrs. Flynn began working for the City of Scranton in August 2008 as an Administrative Assistant / Benefits Coordinator in Human Resources.

21.     During the entirety of her employment, Mrs. Flynn was a Union member.

22.     During the entirety of her employment, Mrs. Flynn has been a vocal political supporter of the local Democratic Party, and is politically associated with the local Democratic Party.

23.     Mrs. Flynn is politically associated with her son, State Senator Marty Flynn.

24.     Senator Flynn at times has been a vocal critic of Mayor Cognetti.

25.     Mrs. Flynn was also politically associated with Chris Cullen, Mayor Paige Cognetti's opponent during the 2019 City of Scranton mayoral race.

26.     Indeed, Mrs. Flynn, was an active supporter of the local Democratic Party, including, specifically, the local Democratic Committee which selected Mr.

Cullen, not Mayor Cognetti, as the Democratic candidate for mayor in the 2019 City of Scranton mayoral election.

27.     At all times material hereto, during her employment as a Rental Registration Assistant, the City of Scranton, including her supervisors and Mayor Paige Cognetti, were aware of Mrs. Flynn's political association with Senator Flynn, the local Democratic Party and local Democratic Committee, as well as former candidate for mayor, Chris Cullen.

28.     At all times material hereto, during her employment as a Rental Registration Assistant, the City of Scranton, including her supervisors and Mayor Paige Cognetti, were aware of Mrs. Flynn's political association with Mayor Cognetti's opponent in the 2019 mayoral election.

29.     Additionally, Mrs. Flynn has been an open and vocal political supporter of her son, State Senator (and former State Representative) Marty Flynn.

30.     Mrs. Flynn worked in several different positions throughout her employment, and moved into the Licenses, Inspections and Permits Department ("LIPD") approximately four years ago.

31.     Mrs. Flynn remained employed with the City until she was fired effective September 21, 2023.

32.     At the time of her termination, Mrs. Flynn was employed as a Rental Registration Assistant, a position she held for approximately three (3) years.

33.     At all times relevant hereto, Mrs. Flynn was an active and vocal member of the Union, Local Lodge No. 2462, the International Association of Machinists and Aerospace Workers, AFL-CIO.

34.     Mrs. Flynn has frequently participated in union activities and engaged in protected speech relating to her union during her employment.

35.     Mrs. Flynn previously participated in an unfair labor practice charge against the City, which was resolved with a Settlement Agreement and General Release.

36.     Mrs. Flynn also repeatedly complained and voiced her concerns to management that the City was not complying with the Collective Bargaining Agreement ("CBA") with the Union, making complaints such as the City failing to fill a vacant Union position and requiring and expecting another Union employee to perform responsibilities of multiple positions.

37.     Approximately eight (8) years ago, Mrs. Flynn had gastric bypass surgery.

38.     Due to her surgery, Mrs. Flynn was required to eat multiple small meals daily.

39.     Mrs. Flynn was not permitted to do so while working, despite her repeated requests informing the City of her medical need for such.

40.     Mrs. Flynn finally had to obtain a medical excuse from her doctor requiring the accommodation of the ability to snack at her desk, an accommodation she maintained until she was fired by the City.

41.     When Mrs. Flynn bid into the position she held when she was fired, the rental registration process was a process performed by two bargaining unit positions – there was a Rental Registration Administrator and a Rental Registration Assistant.

42.     While Mrs. Flynn remained in the Rental Registration Assistant position, the employee who previously held the Rental Registration Administrator position had been terminated, and the position was not being filled.

43.     Mrs. Flynn complained repeatedly and asked why the position was not being filled, as the role was a bargaining unit position, and as Mrs. Flynn was being required to perform the functions of her own position and the position of Rental Registration Administrator.

44.     Mrs. Flynn received no meaningful response from the Union or the City regarding this problem, despite repeatedly complaining about it throughout her employment.

45.     Mrs. Flynn also reached out to Eileen Cipriani, Executive Director of the Office of Community Development, as well as Mayor Paige Cognetti, and again received no response.

46.     Mrs. Flynn is also one of the oldest, if not the oldest employees in the Licensing, Inspections and Permits Department ("LIPD").

47.     Shortly after she bid into the Rental Registration Assistant position, the City began scrutinizing her work performance, including her time card, something they did not do for anyone else in that Department, despite it being common knowledge that Mrs. Flynn had frequent difficulty punching in because of issues with the time clock, affecting the accuracy of the time punches.

48.     Mrs. Flynn's work performance with the City was satisfactory until she moved into the Rental Registration Assistant position.

49.     Mrs. Flynn was subject to a targeted and persistent campaign of harassment, intimidation, and unfounded and unfair scrutiny during her employment.

50.     Initially, Mrs. Flynn's supervisor was Tom Oleski, the Director of Building Code Enforcement, and she was told explicitly that all requests for time off or other issues relating to time should be directed to him or to Andrew Sunday, which is what Mrs. Flynn did.

51.     In February 2022, while she was working as the Rental Registration Assistant in the role with the Rental Registration Administrator role vacant, Mrs. Flynn received a verbal warning for alleged time clock violations.

52.    The verbal warning alleges that she punched in approximately 1 minute to 4 minutes late on several occasions.

53.    Other employees were not disciplined for such *de minimis* infractions of their time punches, especially where the alleged violation was punching in one minute late.

54.    This discipline was an initial attempt to discriminate and retaliate against Mrs. Flynn as the oldest female employee and in retaliation for her complaints about unfair treatment, in that she continued to be expected to perform the job duties of two positions in her role as Rental Registration Assistant.

55.    Eventually, Evan Harbert, a male who is approximately 25 years old, was hired as the Rental Registration Administrator.

56.    Initially, Evan was performing tasks such as processing checks and printing certificates to get them out to the registrants, with Mrs. Flynn assisting and processing the mail.

57.    However, shortly after he was hired, it was claimed that the City was short inspectors, and therefore, Mr. Harbert was required to go on the road and inspect properties, even though he was not properly certified to do that at that time.

58.    Rather than performing the duties and responsibilities of the Rental Registration Administrator position, Mr. Harbert was instead tasked with performing

inspections, something which was not previously the primary duty or responsibility of that position.

59.    Therefore, although Mr. Harbert was hired for the role, the job Mrs. Flynn was performing was that which was previously performed by two full-time Union employees, with the bulk of the responsibilities being conducted by Mrs. Flynn alone.

60.    Mrs. Flynn repeatedly complained about this to her managers and supervisors, including Mr. Oleski and Ms. Cipriani.

61.    Mrs. Flynn also repeatedly complained that the situation was a violation of the CBA and that the Union should be doing something about it.

62.    Previously, the man in Mr. Harbert's role who had the job went on the road maybe two to three times yearly to conduct inspections.

63.    Therefore, even though Mr. Harbert was hired for the Rental Registration Administrator position, he was not performing the duties and responsibilities previously performed because he has been performing inspections, and thus Mrs. Flynn was essentially performing these tasks by herself.

64.    Despite the fact that she was performing work for two positions, the City continued to unnecessarily criticize her work and productivity in order to unfairly discipline her.

65.     As one of the oldest employees in the Department, Mrs. Flynn remained vocal about her desire to eventually retire when the time was right, and she had discussions with her co-workers, including her supervisor, Mr. Oleski, who believed she would retire sometime before the end of 2022.

66.     However, Mrs. Flynn was not able to retire in 2022 because her pension would not vest until August 2024.

67.     Therefore, sometime prior to October 2022, Mr. Oleski and Ms. Cipriani became aware that Mrs. Flynn would not be retiring, and then the unreasonable scrutiny of her work performance intensified.

68.     On November 23, 2022, the day before Thanksgiving, Mrs. Flynn was issued a verbal warning based upon an allegation that she was not entering a sufficient number of checks daily.

69.     Mrs. Flynn was told that she would be required to input a minimum of 15 checks per day, and that she had to take her lunch period by 1:00 p.m.

70.     The number of checks to be entered is not predetermined, and is based solely on the number of checks and registrations received.

71.     Therefore, if there are no applications or requests for registration received, there are likely no checks to input.

72.     Moreover, some property owners have multiple units, and therefore, may submit one check for a number of properties.

73.     In that case, each property has to be inputted into the system, even if only one check is being processed.

74.     Mrs. Flynn's job duties and responsibilities included more than inputting checks -- the position also involved interacting with the public, whether in person or via telephone, which obviously also affected the amount of time spent performing other tasks.

75.     The requirement of inputting 15 checks daily was not an essential function of Mrs. Flynn's position, but instead was an arbitrary requirement created by Mr. Oleski and/or Ms. Cipriani and imposed on her after she repeatedly complained about unfair treatment and the failure to fill the Rental Registration Administrator position vacancy.

76.     On Monday, November 28, 2022, the Monday after the Thanksgiving holiday, Mrs. Flynn was issued a written warning based upon the allegation that Mrs. Flynn had not entered any checks into the City's computer program for processing registrations since the meeting.

77.     The written warning also claimed that Mrs. Flynn had punched out after 1pm on the day of the meeting.

78.     However, Mrs. Flynn had been previously scheduled to leave early for a dental appointment that day, and she explained that Code Enforcement Manager Andrew Sunday, one of her supervisors, had signed off on her leave.

79.     Other employees have not been subjected to such strict scrutiny of their work performance or time clock entries, especially over a short period of time with an intervening holiday.

80.     In January 2023, Robin Selemba, who is substantially younger than Mrs. Flynn, was hired as the Rental Registration Manager, a non-Union position created in 2023.

81.     Mrs. Flynn was her only direct report, and after her hiring, Ms. Selemba effectively reviewed everything Mrs. Flynn did.

82.     Mrs. Flynn was singled out because other employees do not have managers who basically supervise them in a one-on-one capacity.

83.     On January 10, 2023, Mrs. Flynn received a due process hearing notice alleging that she had not fulfilled the arbitrary requirement of entering a minimum of 15 checks per day and that she failed to follow rules relating to how she took her lunch.

84.     On January 18, 2023, Mrs. Flynn received a revised due process hearing notice, which included the violation of February 9, 2022 – nearly one year prior – in the evidence of the allegations alleged against her.

85.     During the due process hearing, Mrs. Flynn explained in detail that the number of checks inputted was not an accurate reflection of her work productivity,

as sometimes, and indeed, frequently, there were multiple registrations for each check.

86.     Mrs. Flynn also explained again that she was responsible for additional duties and responsibilities, as Evan Harbert, the younger male employee who was supposed to be performing some of those duties and responsibilities, had been pulled to do property inspections.

87.     As a result of the due process hearing, Mrs. Flynn was issued a four-day unpaid suspension, whereby she was also purportedly placed on the "last chance" of the progressive discipline policy.

88.     Additionally, Mrs. Flynn was prohibited from bidding on any other positions in the Clerical unit because they deemed her an unqualified and ineligible bidder because she was "on last-chance disciplinary suspension" in violation of the Collective Bargaining Agreement.

89.     Mrs. Flynn had repeatedly complained about her working environment, including harassment by Mr. Oleski and sought to bid out of the department, but the City forced Mrs. Flynn to remain in the Rental Registration Assistant position and the hostile work environment Mrs. Flynn repeatedly complained about, despite the fact that she should have had the opportunity to bid into other positions.

90.     By forcing her to remain in that position, the City also subjected her to one-on-one supervision by the Rental Registration Manager, a position which was

created in an effort by the City to eliminate a Union position and to further erode the Union's presence and numbers in City employment.

91.     Mrs. Flynn complained to the Union, who filed a grievance regarding this practice, but otherwise refused to redress the harm Mrs. Flynn endured.

92.     The intense scrutiny and unfair treatment continued, particularly from Mr. Oleski, and on January 23, 2023, Mrs. Flynn received a Memorandum from Mr. Oleski with five (5) "very specific directives" which she was to follow.

93.     The memorandum also claimed that Mrs. Flynn had "willfully violated these or similar, basic directives in the past" which was simply not true.

94.     Notably, during her due process hearing, there was no mention of any alleged use of "social media platforms" or concerns with these directives.

95.     Previously, Mrs. Flynn had been chastised by Mr. Oleski that all questions about her employment should be directed to his attention, and she had been repeatedly told she had to direct questions to him or Andrew Sunday.

96.     On January 30, 2023, Mrs. Flynn received a four-day suspension.

97.     Other employees, who were all younger than Mrs. Flynn and who had not engaged in protected activity, were not subject to one-on-one scrutiny of their work performance, or such strict imposition of discipline for *de minimis* violations.

98.    Other employees, who were all younger than Mrs. Flynn and who had not engaged in protected activity, were not subject to these types of communication restrictions or directives, or threats of discipline based upon them.

99.    The City improperly justified its decision to issue Mrs. Flynn progressive discipline in order to eventually terminate an older female employee who had complained about unfair treatment and who had previously requested an accommodation under the ADA.

100.    Mrs. Flynn filed a Charge of Discrimination on March 21, 2023, which was dual-filed with the EEOC and the PHRC at Charge No. 530-2023-04268.

101.    Following the filing of her Charge of Discrimination, Mrs. Flynn was subjected to ongoing retaliation by the City.

102.    During the pendency of the EEOC investigation, the City made a point of noting that Mrs. Flynn did not grieve the January 2023 disciplinary suspension, noting that the Union instead challenged the City's determination that she could not bid on other positions – an illegal position by the City which it continued to utilize to deny her request to transfer out of the pervasively hostile work environment of her then-current role.

103.    The City has continued to erode the Union's strength over time, taking steps to eliminate Union positions for non-Union or management positions in a further effort to dilute the strength of the Union, including the creation of the Rental

Registration Manager role (which was non-Union) to handle all of the duties in the Rental Registration office, effectively eliminating Mrs. Flynn's Union-position.

104.   Following the file of her Charge of Discrimination, Mrs. Flynn's interactions with the City regarding her employment, particularly with Human Resources Director Kaylee Pikulski, throughout 2023, became increasingly hostile.

105.   Other employees – who were younger, male, who had not engaged in protected activity, and/or who were not disabled or who had not requested an accommodation - were not treated this way.

106.   These other employees also were not vocal Union supporters.

107.   These other employees were also not political supporters of Mayor Cognetti's opponent or the local Democratic party.

108.   Following the filing of her Charge of Discrimination, the City kept trying to find a reason to fire Mrs. Flynn, and continued to unfairly scrutinize her work and threaten her with termination even for minor or non-existent infractions.

109.   Other employees who had not complained, and who had not engaged in protected activity, were not treated this way.

110.   In July 2023, the Union participated in an arbitration wherein the right to bid into another position was challenged, but the Union had refused to grieve Mrs. Flynn's suspension.

111.   With respect to the ability to bid into another position, the City continued to refuse to allow Mrs. Flynn to do this – even though this violated the CBA with the Union – and despite her repeated requests to remove herself from a hostile work environment.

112.   On June 13, 2023, the unfair and exceedingly harsh and detailed scrutiny of Mrs. Flynn's work performance continued to escalate, and Mrs. Flynn was told she was going to receive a final warning / Performance Improvement Plan (PIP).

113.   The tone of the correspondence received from the City was hostile, and makes specific reference to her filed Charge.

114.   In the correspondence, from HR Director Kaylee Pikulski, she specifically refers to the Charge against the City, and, in what can only be described as a thinly veiled threat related to Mrs. Flynn's protected activity.

115.   In the June 13, 2023, correspondence, the City makes additional, unfounded and unfairly scrutinizing complaints about Mrs. Flynn's employment, including what she did during her lunch break.

116.   Upon information and belief, countless employees of the City engage in similar behavior all of the time without reprimand, and certainly without the threat of being fired.

117.   On this particular occasion, following her lunch break, Mrs. Flynn chose to relax and lounge in an area of City Hall. There was absolutely no indication or suggestion that she was not permitted to be in the area, especially while on her lunch break.

118.   Again, this is indicative of how closely Mrs. Flynn was scrutinized compared to other employees and how completely hostile her working environment had become.

119.   Mayor Cognetti was aware of this ongoing scrutiny and criticism, and made comments about Mrs. Flynn's employment and her performance to other persons outside of the City.

120.   At one point, in 2023, Mayor Cognetti spoke to Senator Flynn via telephone and said "can't you just get your mom a state job and get her out of the City."

121.   As the Mayor of the City of Scranton, Mayor Cognetti was aware of and ratified all employment decisions, including the termination of Mrs. Flynn's employment, and Ms. Cipriani and Mr. Oleski reported to the Mayor.

122.   The City claimed Mrs. Flynn was receiving a PIP in the June 13, 2023 correspondence but she did not receive one before June 15, 2023, when she broke her foot and severely bruised her rib while on her lunch break, resulting in Mrs. Flynn needing to be on extended medical leave.

123.   In or about June 2023, the City completed changed programs utilized for the Rental Registration program, and as such, Mrs. Flynn would need to be trained on the new program.

124.   Mrs. Flynn was scheduled to return to work on Monday, August 14, 2023, which she did.

125.   Upon her return, Mrs. Flynn spent a substantial amount of time reacclimating herself to the position and reviewing emails and any other correspondence that she had received during her two-month absence.

126.   Mrs. Flynn received some assignments from Ms. Selemba on the day of return, but nothing that was identified as time-sensitive or urgent, and certainly nothing with a deadline for completion.

127.   Mrs. Flynn worked on August 14th and August 15th.

128.   On Wednesday, August 16, 2023, at 2:22 p.m., Mrs. Flynn received an email from HR Director Kaylee Pikulski at 2:23 p.m. requiring Mrs. Flynn to come to her office to meet with her to go over the Performance Improvement Plan (PIP).

129.   Curiously, this PIP was the same PIP that Mrs. Flynn was told about on June 13th, which was not provided to her at that time.

130.   Despite the fact that Mrs. Flynn was out of the office for two months, the City still needed three (3) more days to issue her this PIP.

131.   At 3:30 p.m. on August 16th, Mrs. Flynn met with Ms. Pikulski, Tom Oleski and Robin Selemba, and they provided the PIP to review.

132.   Mrs. Flynn would not agree to sign it that day. It was the first time she had seen it, and she wanted the time to review what was included in it, as she believed, and had repeatedly expressed as much, that she was being unfairly treated and more harshly scrutinized than other employees.

133.   Mrs. Flynn was also uncomfortable at the meeting because of Mr. Oleski's presence there, given her previous complaints about how he treated her, and the fact that Ms. Selemba was supposed to be her direct report; Mr. Oleski being there was solely to continue his harassment of Mrs. Flynn, which she had been complaining about for the last year.

134.   The PIP Mrs. Flynn was provided was a two-month plan which stated that she had to perform her duties as Rental Assistant, including:

> charging, collecting and depositing the applicable fees associated with the administration of said ordinance/s and regulations, preparing and mailing correspondence to and dealing with calls and correspondence from property owners, tenants and other interested parties regarding delinquent or non-compliant rentals, creating and maintaining files, forms and reports in paper or electronic form, and performance of other job-related duties as assigned by Management.

135.   During this meeting, they told Mrs. Flynn that she had to get her work performance up, but they also explained that the new program – which she would

24

have to be using to perform this work – was <u>not</u> working, and that it wouldn't be working until September.

136.   Ms. Selemba acknowledged this and agreed to train Mrs. Flynn on the new program.

137.   The nature of this meeting was not identified as relating to anything other than the provision of the PIP which was supposed to be provided to Mrs. Flynn in June 2023, yet Mr. Oleski then asked what Mrs. Flynn had been doing for the past three (3) days.

138.   Mrs. Flynn explained that she had been catching up on emails, and answering calls when they came in.

139.   Ms. Pikulski claimed that Mrs. Flynn was not working the counter, but Mrs. Flynn responded that there were no members of the public coming upstairs because they are not permitted to come past the first floor.

140.   Mrs. Flynn never said no to going down to the counter but she did try to reasonably explain her day.

141.   During this August 16, 2023, meeting, none of the City representatives identified work Mrs. Flynn should have been performing that she did not perform.

142.   Essentially, in her role as Rental Registration Assistant, Mrs. Flynn was tasked with answering the phones, opening the mail, and inputting registrations.

143.   In short, Mrs. Flynn provided a truthful answer to a question from Mr. Oleski during what she believed to be a general discussion, and the City then tried to turn it into some kind of inappropriate behavior on her part justifying yet more unfounded discipline.

144.   During this meeting, Mrs. Flynn again voiced her concerns that the job responsibilities and tasks she was being asked to perform were different than the job she had been hired for – which is a Union position with specific job requirements.

145.   Mrs. Flynn further reiterated that she had been trying to bid out of her role, as she had complained previously about being harassed and treated unfairly, but the City was improperly refusing to allow her to bid for another position – in complete violation of the CBA – and thus she had to remain in the Rental Registration Assistant position.

146.   In response, Ms. Pikulski was abrupt and dismissive, and claimed that Mrs. Flynn's complaint "did not have anything to do with [the discussion about her work responsibilities]" and refused to address her concerns in any way, which had become the standard response from the City to any of Mrs. Flynn's complaints.

147.   Mrs. Flynn was not placed on paid administrative leave at this meeting. She was not told she was going to be disciplined or that she was potentially going to be subject to discipline from this discussion. She was told to go home, was given the PIP and left for the day.

148.   On the way home, Ms. Pikulski then called Mrs. Flynn and told her that she was being placed on paid administrative leave as of August 16, 2023, which was subsequently confirmed by written correspondence.

149.   In the August 16, 2023, correspondence, Ms. Pikulski stated that she would be back in touch with Mrs. Flynn "in the next few business days" regarding when she could return to work.

150.   Mrs. Flynn did not hear from Ms. Pikulski until more than two weeks later, when she received a letter dated September 1, 2023, which stated that she was going to be subjected to a disciplinary hearing on September 5th for allegedly refusing to perform any work upon her return, which was vehemently denied by Mrs. Flynn.

151.   Mrs. Flynn subsequently received correspondence from the City dated September 7, 2023, stating that the City was going to allow her to remain employed on the condition that she sign the PIP and agree to work in accordance with its terms.

152.   The correspondence directed her to return to work on September 11, 2023, with the signed PIP.

153.   Following receipt of the September 7th correspondence, Mrs. Flynn hand wrote a note on September 8, 2023, which was hand delivered to the Human Resources Department, indicating that she had made plans to be out of town from

September 9th to September 13th, and that she had not had the opportunity to put in for the time off because she had been put on paid administrative leave.

154.   Mrs. Flynn asked that she be permitted to return to work on either September 14th or September 18th instead.

155.   Mrs. Flynn also explicitly asked, again, to be considered for a different role, something which she should have been permitted to do under the CBA.

156.   Mrs. Flynn did not hear back from the City, but Mrs. Flynn did not think it was unusual that she had not heard back from the City in that timeframe as she had been on paid administrative leave for *weeks* when Ms. Pikulski had told her that she would be in contact in a few business days.

157.   Despite Mrs. Flynn's lengthy tenure with the City, and despite having previously indicated that she intended to continue working, the City fired Mrs. Flynn on September 21st, claiming she had abandoned her job.

158.   At no time did Mrs. Flynn abandon her job. She had repeatedly asked to be reassigned to a different office – something she should have been permitted to do in her Union position – because of the ongoing harassment, hostile work environment and unfair treatment she was enduring in her role as Rental Assistant – a request which was repeatedly ignored.

159.   The City's claim that Mrs. Flynn abandoned her job was clearly a pretext for unlawful and invidious discrimination and retaliation and the culmination

of an increasingly hostile work environment permeated with unfair and unwarranted scrutiny and criticism aimed at an employee who had repeatedly engaged in protected activity.

**<u>COUNT I</u>**
***Virginia Flynn v. The City of Scranton***
**Age Discrimination and Retaliation in Violation of the ADEA**

160.   The preceding paragraphs are incorporated by reference as though set forth fully herein.

161.   The Age Discrimination in Employment Act (ADEA) makes it unlawful for an employer "to discharge any individual or otherwise discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's age." <u>See</u> 29 U.S.C. §621 *et seq*.

162.   At the time of her termination, Mrs. Flynn was a member of the class protected by the ADEA - individuals over the age of forty (40) years old.

163.   Mrs. Flynn was discriminated against due to her age, and Mrs. Flynn was subjected to the City's ongoing disciplinary actions, hostile work environment and mistreatment, culminating in its decision to terminate her employment, and thus she suffered adverse employment action.

164.   Mrs. Flynn, at all times pertinent hereto, was an individual qualified to perform the Rental Registration Assistant position.

165. The City's ongoing disciplinary actions, hostile work environment and mistreatment, culminating in its decision to terminate Mrs. Flynn's employment, was because of her age, which at the time was 66 years old.

166. The City's ongoing disciplinary actions, hostile work environment and mistreatment, culminating in its decision to terminate Mrs. Flynn's employment, was a pretext for age discrimination.

167. Upon information and belief, Mrs. Flynn's duties and responsibilities are performed by younger employee(s).

168. In discriminating against Mrs. Flynn on the basis of her age, the City violated the provisions of 29 U.S.C. §621 *et seq.,* and specifically, Section 623(a)(1), which makes it unlawful for an employer "to discharge any individual or otherwise discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's age."

169. The City discriminated against Plaintiff in violation of 29 U.S.C. §621 et seq.

170. Mrs. Flynn engaged in protected activity when she complained about the unfair treatment and hostile working environment she was enduring in her position as Rental Registration Assistant.

171. At the time of her termination, Plaintiff had engaged in conduct protected by the ADEA.

172.   Mrs. Flynn has suffered adverse employment action shortly after she engaged in protected activity.

173.   A causal link exists between Mrs. Flynn's protected activity and the City's adverse action against Mrs. Flynn – the City's ongoing disciplinary actions, hostile work environment and mistreatment, culminating in its decision to terminate her employment.

174.   The City retaliated against Mrs. Flynn in violation of 29 U.S.C. §621 *et seq*.

175.   The City's ongoing disciplinary actions, hostile work environment and mistreatment, culminating in its decision to terminate Mrs. Flynn's employment, was a pretext for age discrimination and retaliation.

176.   The actions/omissions of the City were willful, wanton, intentional and/or recklessly indifferent to Mrs. Flynn's federally protected rights.

177.   The actions and/or omissions of the City were the direct and proximate cause of Plaintiff's harm and damages.

178.   As a direct and proximate result of the City's violation of the ADEA as set forth herein, Mrs. Flynn is entitled to damages including, but not limited to, compensatory damages; liquidated damages; damages for future pecuniary loss; back pay; front pay; loss of benefits; costs of suit; attorneys' fees; and other relief as the Court deems equitable and just.

WHEREFORE, Plaintiff, Virginia Flynn, respectfully requests that this Honorable Court grant her damages and relief as set forth in the Prayer for Relief included with this Complaint, and any other relief this Honorable Court deems necessary and appropriate.

## COUNT II
### *Virginia Flynn v. The City of Scranton*
**Disability Discrimination and Retaliation in Violation of the ADA**

179. The preceding paragraphs are incorporated by reference as though set forth fully herein.

180. Mrs. Flynn is a "qualified individual with a disability" as that term is defined by the ADA because she has, or at all times relevant hereto, had a disability that substantially limited and affected one or more major life activities.

181. Plaintiff is a "qualified individual with a disability" as that term is defined by the ADA because she has, or at all times relevant hereto, had a record of an impairment that substantially limited and affected one or more major life activities.

182. Mrs. Flynn is a "qualified individual with a disability" as that term is defined by the ADA because she was regarded as and/or was perceived by Defendant as having a physical impairment that substantially limits or limited one or more major life activities.

183.   Despite her disability, Mrs. Flynn was still able to perform the essential functions of her job with or without a reasonable accommodation.

184.   Mrs. Flynn sought and received an accommodation for her disability.

185.   The City was aware of Mrs. Flynn's condition and her requested accommodation which remained in effect until she was fired.

186.   Mrs. Flynn was subjected to unfair treatment and overly harsh scrutiny of her work, specifically including how, when and where she took her lunch break, by the City and her supervisors, because of her disability and need for accommodation.

187.   Mrs. Flynn repeatedly objected to and/or complained of the City's harassing and discriminatory behavior, but her concerns were ignored, and the retaliatory and discriminatory harassment and mistreatment continued and increased.

188.   Mrs. Flynn was subjected to the City's ongoing disciplinary actions, hostile work environment and mistreatment, culminating in its decision was terminate her employment in close proximity to her complaints about mistreatment, specifically, while her Charge of Discrimination remained pending with the EEOC.

189.   Mrs. Flynn believes and therefore avers that she was subjected to a hostile work environment, including the City's ongoing disciplinary actions and mistreatment, culminating in its decision to terminate her employment because of

(1) her known and/or perceived disabilities; (2) her record of impairment; (3) her requested accommodations (which constitutes illegal retaliation); and (4) her expressed concerns of unfair treatment.

190.  Mrs. Flynn engaged in protected activity when she complained about the unfair treatment and hostile working environment she was enduring in her position as Rental Registration Assistant.

191.  At the time of her termination, Plaintiff had engaged in conduct protected by the ADA.

192.  Mrs. Flynn has suffered adverse employment action shortly after she engaged in protected activity.

193.  A causal link exists between Mrs. Flynn's protected activity and the City's adverse action against Mrs. Flynn – the City's ongoing disciplinary actions, hostile work environment and mistreatment, culminating in its decision to terminate her employment.

194.  The City retaliated against Mrs. Flynn in violation of 42 U.S.C. §12101 *et seq.*

195.  The City's ongoing disciplinary actions, hostile work environment and mistreatment, culminating in its decision to terminate Mrs. Flynn's employment was a pretext for disability discrimination and retaliation.

196.  These actions as aforesaid constitute violations of the ADA.

34

197.   As a result of this discriminatory and retaliatory treatment, Mrs. Flynn has suffered damages.

WHEREFORE, Plaintiff, Virginia Flynn, respectfully requests that this Honorable Court grant her damages and relief as set forth in the Prayer for Relief included with this Complaint, and any other relief this Honorable Court deems necessary and appropriate.

### COUNT III
***Virginia Flynn v. The City of Scranton***
**Gender Discrimination and Retaliation in Violation of Title VII**

198.   The preceding paragraphs are incorporated by reference as thought set forth fully herein.

199.   Title VII of the Civil Rights Act of 1964, as amended, enables Mrs. Flynn to pursue an action for the unlawful employment practices of the City, which include violations related to discrimination, retaliation, and unlawful termination.

200.   Mrs. Flynn, a female employee, was treated less favorably than other male employees and was subject to discrimination because she was female.

201.   Mrs. Flynn was subjected to the City's ongoing disciplinary actions, hostile work environment and mistreatment, culminating in its decision to terminate her employment, and therefore, she has suffered adverse employment actions.

202.   Mrs. Flynn, at all times pertinent hereto, was a qualified individual who was performing the functions and responsibilities of her job.

203.   Other similarly situated male employees were treated more favorably, including Evan Harbert.

204.   Mrs. Flynn engaged in protected activity when she complained about the unfair treatment and hostile working environment she was enduring in her position as Rental Registration Assistant.

205.   At the time of her termination, Plaintiff had engaged in conduct protected by Title VII.

206.   Mrs. Flynn has suffered adverse employment action shortly after she engaged in protected activity.

207.   A causal link exists between Mrs. Flynn's protected activity and the City's adverse action against Mrs. Flynn – the City's ongoing disciplinary actions, hostile work environment and mistreatment, culminating in its decision to terminate her employment.

208.   The City retaliated against Mrs. Flynn in violation of 42 U.S.C. §2000e *et seq.*

209.   The City's ongoing disciplinary actions, hostile work environment and mistreatment, culminating in its decision to terminate Mrs. Flynn's employment, was a pretext for gender discrimination and retaliation.

210.   The City discriminated against and retaliated against Plaintiff in violation of 42 U.S.C. §2000e et seq.

211.   The actions surrounding the City's ongoing disciplinary actions, hostile work environment and mistreatment, culminating in its decision to terminate Mrs. Flynn's employment, give rise to an inference of intentional discrimination in that male employees were treated more favorably, and Mrs. Flynn, a female employee who complained, was mistreated, and ultimately terminated.

212.   The actions/omissions of the City were willful, wanton, intentional and/or recklessly indifferent to Mrs. Flynn's federally protected rights.

213.   The actions and/or omissions of the City were the direct and proximate cause of Mrs. Flynn's harm and damages.

214.   As a direct and proximate result of the City's violation of Title VII as set forth herein, Mrs. Flynn is entitled to damages including, but not limited to, compensatory damages; punitive damages; damages for future pecuniary loss; back pay; front pay; loss of benefits; costs of suit; attorneys' fees; and other relief, such as punitive damages, as the Court deems equitable and just.

WHEREFORE, Plaintiff, Virginia Flynn, respectfully requests that this Honorable Court grant her damages and relief as set forth in the Prayer for Relief included with this Complaint, and any other relief this Honorable Court deems necessary and appropriate.

## COUNT IV

***Virginia Flynn v. The City of Scranton and Mayor Cognetti***
**42 U.S.C. §1983**
**First Amendment Retaliation – Union Membership**

215.   The preceding paragraphs are incorporated by reference as though set forth fully herein.

216.   Mrs. Flynn was an active and vocal member of the Union.

217.   Mrs. Flynn suffered an adverse employment action because of her Union membership, including unfair and unfounded discipline, and the City's refusal to allow her to remove herself from the hostile work environment in the Licensing and Permits Department Office by bidding into another position.

218.   Defendants, City of Scranton and Mayor Cognetti, terminated Mrs. Flynn's employment because she exercised her First Amendment free association and free speech rights, specifically, her Union membership, and her employment in a Union position which the City actively sought to replace with a non-Union role.

219.   Defendants conspired with others to retaliate against Mrs. Flynn because she exercised her First Amendment free association and free speech rights.

220.   Mayor Cognetti conspired with Mr. Oleski and Ms. Cipriani to retaliate against Mrs. Flynn because she exercised her First Amendment free association and free speech rights.

221.   The City developed and maintained a number of deficient policies and/or custom which caused the deprivation of Plaintiffs' constitutional rights.

222.   Mayor Cognetti personally participated in and acquiesced to the discrimination and/or retaliation, and also served as a policymaker for the policies and customs of the City and the LIPD.

223.   The City's policies and customs encouraged Mayor Cognetti, Mr. Oleski and Ms. Cipriani to believe that they could violate the constitutional rights of Plaintiff with impunity and with the explicit or tacit approval of Mayor Cognetti.

224.   Defendants' conduct therefore was a deprivation, under color of state law, of rights guaranteed to Mrs. Flynn under the First and Fourteenth Amendments to the United States Constitution.

225.   As a result of Defendants' violations of her Constitutional rights, Mrs. Flynn suffered, and continues to suffer, substantial injuries and damage.

WHEREFORE, Plaintiff, Virginia Flynn, respectfully requests that this Honorable Court grant her damages and relief as set forth in the Prayer for Relief included with this Complaint, and any other relief this Honorable Court deems necessary and appropriate.

## COUNT V

### *Virginia Flynn v. The City of Scranton and Mayor Cognetti*
### 42 U.S.C. §1983
### First Amendment Retaliation – Union Activity

226.   The preceding paragraphs are incorporated by reference as though set forth fully herein.

227.   Mrs. Flynn engaged in protected Union activity when she complained to her Union and filed a grievance.

228.   Mrs. Flynn also engaged in protected Union activity and speech when she complained about the City assigning bargaining unit work to management employees.

229.   Mrs. Flynn also engaged in protected Union activity and speech when she repeatedly complained to her supervisors that the City was trying to improperly and unlawfully eliminate Union positions.

230.   Mrs. Flynn also engaged in protected speech and protected Union activity when she repeatedly complained to her supervisors that the City was trying to improperly and unlawfully weaken and eliminate the Union entirely.

231.   Defendants conspired with others to retaliate against Mrs. Flynn because she exercised her First Amendment free association and free speech rights.

232.   Mrs. Flynn's speech was a matter of public concern protected by the First Amendment.

233.   Mrs. Flynn was speaking as a citizen.

234.   The City did not have any justification for treating Mrs. Flynn differently.

235.   The City developed and maintained a number of deficient policies and/or custom which caused the deprivation of Plaintiffs' constitutional rights.

236.   Mayor Cognetti personally participated in and acquiesced to the discrimination and/or retaliation, and also served as a policymaker for the policies and customs of the City and the LIPD.

237.   The City's policies and customs encouraged Mayor Cognetti, Mr. Oleski and Ms. Cipriani to believe that they could violate the constitutional rights of Plaintiff with impunity and with the explicit or tacit approval of the City.

238.   Defendants' conduct therefore was a deprivation, under color of state law, of rights guaranteed to Mrs. Flynn under the First and Fourteenth Amendments to the United States Constitution.

WHEREFORE, Plaintiff, Virginia Flynn, respectfully requests that this Honorable Court grant her damages and relief as set forth in the Prayer for Relief included with this Complaint, and any other relief this Honorable Court deems necessary and appropriate.

## COUNT VI

***Virginia Flynn v. The City of Scranton and Mayor Cognetti***
**42 U.S.C. §1983**
**First Amendment Retaliation – Political Association and Speech**

239.  The preceding paragraphs are incorporated by reference as though set forth fully herein.

240.  Mrs. Flynn's position was not a position for which a political association requirement would be appropriate.

241.  Mrs. Flynn engaged in protected speech and association, and was also perceived as being associated with her son, Senator Marty Flynn, the local Democratic Party, the Democratic Committee of the local Democratic Party, and Mayor Cognetti's political opponent during the 2019 City of Scranton mayoral election.

242.  Mrs. Flynn's speech was a matter of public concern protected by the First Amendment.

243.  Mrs. Flynn was speaking as a citizen.

244.  The City did not have any justification for treating Mrs. Flynn differently.

245.  Mrs. Flynn was perceived as not being politically associated with Mayor Cognetti.

246. Mrs. Flynn engaged in protected speech when she supported her son, Senator Marty Flynn, during his election campaigns.

247. Mrs. Flynn also engaged in protected speech when she supported the opponent of Mayor Cognetti in the 2019 City of Scranton mayoral election.

248. Mrs. Flynn attended rallies, placed signs in her yard, and vocally expressed her support at a variety of functions.

249. Mayor Cognetti was fully aware that Mrs. Flynn was the mother of Senator Flynn, and that Senator Flynn and Mrs. Flynn supported a different candidate in the 2019 City of Scranton mayoral election.

250. Defendants terminated Mrs. Flynn's employment because she exercised her First Amendment free association and free speech rights, specifically, her political association with her son, Senator Marty Flynn, her political non-association with Mayor Cognetti, and her exercise of free speech in support of Senator Flynn.

251. Defendants terminated Mrs. Flynn's employment because she exercised her First Amendment free association and free speech rights, specifically, her political association with Chris Cullen, Mayor Cognetti's opponent in the 2019 City of Scranton mayoral election, and her exercise of free speech in support of Mr. Cullen.

252. Defendants terminated Mrs. Flynn's employment because she exercised her First Amendment free association and free speech rights, specifically, her

political association with the Lackawanna County Democratic Committee, and her exercise of free speech in support the Lackawanna County Democratic Committee, which nominated Mayor Cognetti's opponent, Chris Cullen, in the 2019 City of Scranton mayoral election.

253. Indeed, Mayor Cognetti has commented about Mrs. Flynn's employment and disciplinary actions relating to her employment to other persons outside of the City.

254. At one point, in 2023, Mayor Cognetti spoke to Senator Flynn via telephone and said "can't you just get your mom a state job and get her out of the City."

255. Defendants conspired with others to retaliate against Mrs. Flynn because she exercised her First Amendment free association and free speech rights.

256. The City developed and maintained a number of deficient policies and/or custom which caused the deprivation of Plaintiffs' constitutional rights.

257. Mayor Cognetti personally participated in and acquiesced to the discrimination and/or retaliation, and also served as a policymaker for the policies and customs of the City and the LIPD.

258. The City's policies and customs encouraged Mayor Cognetti, Mr. Oleski and Ms. Cipriani to believe that they could violate the constitutional rights of Plaintiff with impunity and with the explicit or tacit approval of the City.

259.   Defendants' conduct therefore was a deprivation, under color of state law, of rights guaranteed to Mrs. Flynn under the First and Fourteenth Amendments to the United States Constitution.

260.   As a result of Defendants' violations of her Constitutional rights, Mrs. Flynn suffered, and continues to suffer, substantial injuries and damage.

WHEREFORE, Plaintiff, Virginia Flynn, respectfully requests that this Honorable Court grant her damages and relief as set forth in the Prayer for Relief included with this Complaint, and any other relief this Honorable Court deems necessary and appropriate.

### COUNT VII
### *Virginia Flynn v. Union*
### BREACH OF DUTY OF FAIR REPRESENTATION

261.   The preceding paragraphs are incorporated by reference as though set forth fully herein.

262.   The Public Employees Relations Act, 43 P.S. §1101.101 *et seq.,* governs the right to union representation by public employees with public employers, including political subdivisions like Defendant, City of Scranton.

263.   The Union and the City are parties to a Collective Bargaining Agreement which specifically provides that an employee will not be subject to discipline except for just cause.

264.   At all relevant times hereto, Mrs. Flynn was a member of the Union.

265.   As a member of the Union, Mrs. Flynn is entitled to fair representation by the Union.

266.   The City wrongfully discriminated against Mrs. Flynn and retaliated against her, culminating in the termination of her employment on September 21, 2023.

267.   Despite the fact that Mrs. Flynn was wrongfully terminated by the City, and despite the fact that Mrs. Flynn has been complaining about the City's treatment of her and the hostile working environment she endured, the Union refused to pursue an arbitration on behalf of Mrs. Flynn.

268.   The Union's refusal to pursue a claim on behalf of Mrs. Flynn for the wrongful termination of her employment is arbitrary, capricious, and demonstrates bad faith.

269.   The City actively participated in the Union's bad faith and/or conspired and colluded with the Union to deny Mrs. Flynn her rights under the CBA.

270.   The Union has a history of refusing to grieve and/or pursue arbitration on behalf of Mrs. Flynn and other Union members despite Mrs. Flynn's complaints of unfair treatment, discrimination, retaliation and harassment in her employment.

271.   The Union has breached its duty of fair representation to Mrs. Flynn.

272.   As a result of the breach, Mrs. Flynn has suffered damages.

WHEREFORE, Plaintiff, Virginia Flynn, respectfully requests that this Honorable Court grant her damages and relief as set forth in the Prayer for Relief included with this Complaint, and any other relief this Honorable Court deems necessary and appropriate.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, Virginia Flynn, respectfully requests that this Honorable Court enter judgment in Plaintiff's favor and an Order as follows:

(a) Defendant, the City of Scranton, is permanently enjoined from discriminating against Plaintiff on the basis of her gender, age, and/or disability, or any basis prohibited under applicable federal and state law;

(b) Defendant, the City of Scranton, is permanently enjoined from retaliating against Plaintiff on the basis of her complaints of discrimination, or any basis prohibited under applicable federal and state law;

(c) Defendant, the City of Scranton, is prohibited from continuing to maintain its illegal policy, practice, or custom of discriminating against employees based upon their age, gender, disability, and/or retaliation, and is to be ordered to promulgate an effective policy against such discrimination and/or retaliation and to adhere thereto;

(d) Defendant, the City of Scranton, is required to pay Plaintiff appropriate front pay;

(e) Defendant, the City of Scranton, is to compensate Plaintiff, reimburse Plaintiff, and to make Plaintiff whole for any and all back pay and benefits Plaintiff would have received had it not been for Defendant's illegal actions, including but not limited to, back pay, front pay, salary, pay increases, bonuses, medical and other benefits, training, promotions, pension, and seniority. Plaintiff should be accorded those benefits illegally withheld from the date she first suffered discrimination at the hands of Defendant until the date of verdict;

(f) Plaintiff is to be awarded actual damages, as well as compensatory damages for the pain, suffering and humiliation caused to her by Defendants' actions;

(g) As to Counts IV-VI, Plaintiff is to be awarded punitive damages against the individual Defendant in an amount to be determined pursuant to 42 U.S.C. §1983 for Defendants' violation of Mrs. Flynn's constitutional rights;

(h) As to Count VII, Plaintiff is entitled to an order compelling arbitration to be filed by the Union on the termination of her employment from the City of Scranton;

(i) As to Count VII, Plaintiff is to be awarded appropriate damages in an amount to be determined for Defendant's breach of its duty of fair representation to Mrs. Flynn;

(j) Plaintiff is to be accorded any and all other equitable and legal relief as the Court deems just, proper, and appropriate;

(k) Plaintiff is to be awarded the costs and expenses of this action and reasonable attorneys' fees as provided by applicable federal and state law;

(l) Any verdict in favor of Plaintiff is to be molded by the Court to maximize the financial recovery available to Plaintiff in light of the caps on certain damages as set forth in applicable federal law;

(m)       Plaintiff is to be granted such additional injunctive or other relief as she may request during the pendency of this action in an effort to ensure Defendant does not engage in illegal retaliation against Plaintiff or other witnesses to this action;

(n) The Court is to maintain jurisdiction of this action after verdict to ensure compliance with its Orders therein;

(o) Plaintiff's claims against Defendants are to receive a trial by jury to the extent allowed by applicable law, and as requested by Plaintiff pursuant to Federal Rule of Civil Procedure 38(b).

## <u>JURY TRIAL DEMANDED</u>

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff hereby requests and demands a jury trial.

Respectfully Submitted,

*/s/ Jennifer Menichini*
Lawrence J. Moran, Jr. (PA ID 316253)
Jennifer Menichini (PA ID 200917)
**Joyce, Carmody & Moran, P.C.**
9 N. Main St., Suite 4
Pittston, PA 18640
Ph: (570) 602-3560
Fax: (570) 602-3561
Email: ljm@joycecarmody.com
          jm@joycecarmody.com

DATED: January 12, 2024