## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **VIRGINIA FLYNN,** | : | **No. 3:24cv64** |
| **Plaintiff** | : | |
| | : | **(Judge Munley)** |
| **v.** | : | |
| | : | |
| **CITY OF SCRANTON, MAYOR** | : | |
| **PAIGE COGNETTI, individually, and** | : | |
| **LOCAL LODGE NO. 2462, THE** | : | |
| **INTERNATIONAL ASSOCIATION** | : | |
| **OF MACHINISTS AND AEROSPACE** | : | |
| **WORKERS, AFL-CIO,** | : | |
| **Defendants** | : | |

:::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

## <u>MEMORANDUM</u>

Before the court are three motions in this employment discrimination and civil rights action filed by Plaintiff Virginia Flynn: 1) a motion to dismiss plaintiff's amended complaint filed by Defendants City of Scranton and Mayor Paige Cognetti ("City Defendants") (Doc. 25); 2) a motion to dismiss filed by Defendant Local Lodge No. 2462, The International Association of Machinists and Aerospace Workers, AFL-CIO ("Union Defendant") (Doc. 24); and 3) plaintiff's motion for leave to file a second amended complaint (Doc. 42). Having been fully briefed, these motions are ripe for disposition.

**Background**

Plaintiff previously worked for the City of Scranton in its Licenses, Inspections and Permits Department ("LIPD") and belonged to a labor union. Per

her allegations in the amended complaint, the City Defendants engaged in a concerted effort to discriminate and retaliate against the plaintiff in violation of the Americans with Disabilities Act ("ADA"), the Age Discrimination in Employment Act ("ADEA"), Title VII of the Civil Rights Act of 1964 ("Title VII"), and the Pennsylvania Human Relations Act ("PHRA").   Plaintiff also asserts that the City Defendants retaliated against her for her political speech, political association, union activity, and union membership and thus, she seeks recourse pursuant to 42 U.S.C. § 1983 ("Section 1983") for violation of her First Amendment rights.  As for the Union Defendant, plaintiff alleges that it breached its duty of fair representation.

Plaintiff worked for the City of Scranton for approximately fifteen (15) years until she was terminated on September 21, 2023.[1] (Doc. 22, Am. Compl. ¶¶ 20, 33).  Prior to being fired, plaintiff worked as a Rental Registration Assistant for the city. (Id. ¶¶ 33-34).

The City of Scranton and Union Defendant are subject to a Collective Bargaining Agreement ("CBA").  (Id. ¶¶ 38, 284).  The CBA applies to certain unionized positions in the LIPD, including plaintiff's position. (Id. ¶ 15).  Plaintiff

---

[1] At this stage of the proceedings, the court must accept all factual allegations in the plaintiff's pleadings as true.  Phillips v. Cnty. of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008)(citations omitted).  The court makes no determination, however, as to the ultimate veracity of these assertions.

avers that, during her employment, she was an active and vocal member of the Union Defendant, including participating in unfair labor charges against the city and repeatedly complaining that the city failed to comply with the terms of the CBA. (Id. ¶¶ 21, 35, 37–38).  For example, two union employees typically performed the city's rental registration processes.  (Id. ¶ 45).  After the city terminated the other employee handling rental registrations, the city required plaintiff to perform the functions of both jobs. (Id. ¶¶ 45–46).  Plaintiff alleges that she complained repeatedly about the other unionized position not being filled. (Id. ¶¶ 46, 295–96).  Per plaintiff, she received no meaningful response from the defendants. (Id. ¶¶ 47–48).

Plaintiff also alleges that she actively and vocally supported the local Democratic Party and associated herself politically with the Lackawanna County Democratic Committee. (Id. ¶¶ 22, 27, 273).  In 2019, plaintiff supported Chris Cullen as candidate for mayor, as did the local committee. (Id. ¶ 27, 273).  The local committee nominated Cullen and not Defendant Cognetti as its candidate. (Id.)  Defendant Cognetti won the election.

Additionally, plaintiff's son, Marty Flynn, is a Senator in the General Assembly of the Commonwealth of Pennsylvania. (See id. ¶ 23).  He is also a former State Representative. (Id. ¶ 30).  Plaintiff has openly and vocally supported her son and his political efforts. (Id.)  As alleged, Senator Flynn has

been a critic of Defendant Cognetti, especially during the November 2022 election period. (Id. ¶ 25). Plaintiff also avers that Defendant Cognetti spoke to Senator Flynn at one point in 2023 by phone and stated, "can't you just get your mom a state job and get her out of the city." (Id. ¶ 138).

Furthermore, plaintiff alleges that, during her employment, she experienced issues requiring gastric bypass surgery. (Id. ¶¶ 19, 39). Afterwards, plaintiff obtained accommodation from the city to eat at her desk pursuant to the ADA. (Id. ¶¶ 40-42, 202–03). Nonetheless, plaintiff alleges that she experienced criticism for eating at her desk and more scrutiny than other employees regarding lunch breaks from supervisors. (Id. ¶¶ 43-44). Her repeated complaints about such conduct were ignored. (Id. ¶ 205).

Plaintiff was 66 years old at the time the city terminated her employment. (Id. ¶ 183). She alleges that she was one of the oldest employees in the LIPD, if not the oldest. (Id. ¶ 50). Plaintiff advances that her Rental Registration Assistant duties are now being performed by younger city employees. (Id. ¶ 185).

Plaintiff avers that she began to experience discrimination and harassment upon her transfer into the Rental Registration Assistant position. (Id. ¶¶ 53-54). Her initial supervisor was Tom Oleski, Director of Building Code Enforcement for the city. (Id. ¶ 55). Plaintiff complained about harassment from Oleski and his creation of a hostile work environment prior to her termination.  (Id. ¶ 56).

4

Despite complying with directives regarding time off requests and known issues with the city's time clock, plaintiff alleges that, in February 2022, she received a verbal warning for purportedly punching in between one (1) and four (4) minutes late. (Id. ¶¶ 51, 57–59).  On the other hand, younger, non-disabled employees were not disciplined for such infractions, nor were their time entries as scrutinized. (Id. ¶¶ 51, 60–61).

At some point in 2022, the city filled the Rental Registration Administrator position with a male employee, approximately forty (40) years younger than the plaintiff. (Id. ¶¶ 58, 63).  Shortly after this individual was hired, however, Oleski determined that plaintiff's new coworker was required to leave the office and inspect properties. (Id. ¶ 65).  Per plaintiff, such decision-making resulted in plaintiff again performing the bulk of the rental registration responsibilities. (Id. ¶¶ 66–67, 71–72).  Plaintiff alleges that this new employee was treated more favorably by Oleski based on age and gender. (Id. ¶ 223).   Plaintiff also complained to the defendants about this situation. (Id. ¶¶ 69–70, 295–96).

Plaintiff then received a verbal warning on November 23, 2022 (Thanksgiving Eve) based on an allegation that she failed to enter a sufficient number of rental registration checks each day. (Id. ¶ 80).  Around that time, plaintiff alleges that her supervisors learned that plaintiff would not be retiring in 2022 as plaintiff alluded to in previous discussions. (Id. ¶¶ 75, 78).  Additionally,

5

plaintiff had been actively campaigning for her son's election in the build-up to the November 2022 election. (Id. ¶ 78). After the verbal warning, the city then imposed requirements that plaintiff would need to input a minimum of fifteen (15) checks per day and that she needed to take her lunch break by 1:00 PM. (Id. ¶ 81). Per plaintiff, the minimum check requirement was arbitrary, did not reflect the realities of the city's rental registration program. (Id. ¶¶ 82–87). The requirement was imposed by Oleski and Eileen Cipriani, the city's Director of Economic and Community Development, due to plaintiff's complaints about unfair treatment and the city's failure to fill the other rental registration position. (Id.)

Plaintiff received a written warning on November 28, 2022 (the Monday after Thanksgiving) based on allegations that she improperly punched out on Thanksgiving Eve and that she had not entered any rental registration checks into the city's processing software since that date. (Id. ¶¶ 88–89). Plaintiff alleges that she left early on Thanksgiving Eve for a dental appointment and that such leave was previously approved by one of her supervisors, but ostensibly not Oleski or Cipriani. (Id. ¶¶ 78, 90–91).

Then, in January 2023, the city created a non-union Rental Registration Manager position and hired Robin Selemba to fill that role. (Id. ¶ 93). Selemba is substantially younger than the plaintiff. (Id.) Per plaintiff, the city created this

6

position and hired Selemba solely to supervise plaintiff in a one-on-one capacity and to scrutinize her work. (Id. ¶¶ 94–95, 104–106).

That same month, on January 10 and January 18, 2023, plaintiff received due process hearing notices alleging that she violated check processing and time-clock requirements. (Id. ¶¶ 96–97).  Although plaintiff explained at the hearing how the number of checks inputted was not an accurate reflection of her productivity, the city imposed a four-day unpaid suspension and placed plaintiff on the last step of the progressive discipline policy. (Id. ¶¶ 98–100).  Plaintiff alleges that the city also prevented her from bidding out of her position in the LIPD (in violation of the CBA) and forced her to remain in a hostile work environment that she previously complained about. (Id. ¶¶ 101–102, 104, 128).  Union Defendant filed a grievance over loss of the right to bid into another position and brought the matter to arbitration, but, according to the plaintiff, the union otherwise failed to redress plaintiff's particular situation, including the suspension. (Id. ¶¶ 107, 127).

On March 21, 2023, plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") and Pennsylvania Human Relations Commission ("PHRC") against the city. (Id. ¶ 116).  Following the filing of that charge, plaintiff alleges that her interactions with the city regarding her employment became increasingly hostile, particularly with the city's HR director

Kaylee Pikulski. (Id. ¶ 120).  In correspondence dated June 13, 2023, plaintiff received a final warning, and the city placed her on a Performance Improvement Plan ("PIP").  (Id. ¶¶ 129, 132).  The correspondence allegedly referenced plaintiff's charge of discrimination. (Id. ¶ 130).  Two days after the date of the PIP letter, on June 15, 2023, plaintiff broke her foot and bruised her ribs, which required plaintiff to take extended medical leave. (Id. ¶ 140).  She returned to work on August 14, 2023. (Id. ¶ 142).

On August 16, 2023, at 3:30 PM, HR Director Pikulski reviewed the PIP with plaintiff for the first time. (Id. ¶¶ 146-149).  Oleski, the Director of Code Enforcement, and Selemba, the Rental Registration Manager, were also involved in the meeting.  The PIP spelled out the duties the city expected the plaintiff to perform. (Id. ¶ 152).  On the other hand, the city explained that a new rental registration program implemented in June 2023 was not working and was not expected to be working until September. (Id. ¶ 153).  Plaintiff alleges that she also needed to be trained on the program. (Id. ¶¶ 141, 154).

Plaintiff did not agree to sign the PIP at the meeting. (Id. ¶ 150).  Oleski's presence at the meeting also made plaintiff uncomfortable because of her previous complaints about his treatment. (Id. ¶ 151).  At the PIP meeting, Oleski asked plaintiff what she had been doing at work for the past three days. (Id. ¶ 155).  Additionally, Pikulski claimed that plaintiff was not performing her job at the

rental registration counter. (Id. ¶ 157).  Plaintiff explained that she had been catching up on emails and answering calls over the previous three workdays and that no members of the public were permitted to come to the counter. (Id. ¶¶ 156–57).  During the meeting, plaintiff again voiced her ongoing concerns, specifically that she was performing tasks different from the job she was hired for, and that the city continued to violate the CBA by not letting her bid for another position. (Id. ¶¶ 162–163).  Pikulski became abrupt and dismissive in response. (Id. ¶ 164).  Plaintiff was handed the PIP and told to go home. (Id. ¶ 165).  Pikulski then called plaintiff after the meeting and told her that she was being placed on paid administrative leave, which was confirmed in written correspondence dated August 16, 2023. (Id. ¶ 166).  Pikulski stated that she would be back in touch with plaintiff "in the next few business days" regarding her return to work. (Id. ¶ 167).

More than two weeks later, plaintiff received a letter scheduling a disciplinary hearing for September 5, 2023, based on allegations that she refused to perform work upon her return from medical leave.[2] (Id. ¶ 168). On September 7, 2023, plaintiff received correspondence indicating that the city would allow her to remain employed so long as she signed the PIP and agreed to work in

---

[2] While otherwise fact-intensive, the amended complaint does not allege whether that hearing actually took place and, if so, whether plaintiff attended.

accordance with its terms. (Id. ¶ 169).  The correspondence directed her to return to work on September 11, 2023 with the signed PIP. (Id. ¶ 170).

Subsequently, plaintiff requested to return to work on September 14 or September 18, 2023, because she planned to be out of town until September 13, 2023. (Id. ¶¶ 171–72).  She also asked to be considered for a different role, as permitted under the CBA. (Id. ¶ 173).  Despite her correspondence being hand-delivered, plaintiff did not hear back from the city. (Id. ¶ 171, 174).   Plaintiff did not think that was unusual under the circumstances. (Id. ¶ 174).  The city then fired plaintiff on September 21, 2023, claiming that she abandoned her job. (Id. ¶ 175).  Plaintiff contends that she did not abandon her job and indicated she wished to continue working. (Id. ¶¶ 175–76).  Moreover, plaintiff also alleges that she was asserting her position that the city was violating the CBA by refusing to let her transfer out of LIPD. (Id. ¶¶ 173, 176).

Based on the above alleged events, plaintiff advances the following causes of action against the City of Scranton:

- **Count I** – age discrimination and retaliation in violation of the ADEA, (Id. ¶¶ 178–196);

- **Count II** – disability discrimination and retaliation in violation of the ADA, (Id. ¶¶ 178–196);

- **Count III** – gender discrimination and retaliation in violation of Title VII, (Id. ¶¶ 217–235); and

- **Counts VIII–X** – age, gender, and disability discrimination in violation of the PHRA, (Id. ¶¶ 299–318).

Plaintiff also asserts three Section 1983 claims against both City Defendants, including Defendant Cognetti:

- **Count IV** – First Amendment retaliation based on union membership, (Id. ¶¶ 236–246);

- **Count V** - First Amendment retaliation based on union activity, (Id. ¶¶ 247–259); and

- **Count VI** – First Amendment retaliation based on political association and speech, (Id. ¶¶ 260–281). [3]

Additionally, in Count VII of the amended complaint, plaintiff advances a claim against the Union Defendant for breach of the duty of fair representation pursuant to Pennsylvania's Public Employe Relations Act, 43 PA. STAT. § 1101.101 ("PERA"). (Id. ¶¶ 282-298).

As noted above, plaintiff dual-filed a charge of discrimination with the EEOC and PHRA on March 21, 2023. (Id. ¶ 5a). Following her termination in September 2023, plaintiff filed a supplemental charge of discrimination to include additional facts relating to her firing. (Id. ¶ 6).  The supplemental charge remained pending with the EEOC as of the filing of the amended complaint. (Id.) Plaintiff thus indicated that she would seek leave to amend her complaint again

---

[3] Count XI of the amended complaint includes an aiding and abetting discrimination claim against Defendant Cognetti in violation of the PHRA. (Doc. 22, ¶¶ 319–322).  City Defendants do not move to dismiss this claim.  (See Doc. 29 at 1).

11

to add retaliatory termination claims following the exhaustion of the administrative process.  (Id. ¶¶ 6, 7, n. 2).

On May 20, 2024, Union Defendant filed a motion to dismiss the amended complaint for failure to state a claim. (Doc. 24).  City Defendants followed with their own motion to dismiss filed that same date. (Doc. 25).  One of the arguments raised by the City Defendants is that plaintiff failed to exhaust administrative remedies regarding her ADA, ADEA, and Title VII claims. (Doc. 29 at 6-8).

With the motions to dismiss pending, plaintiff filed a motion for leave to file a second amended complaint on October 22, 2024, (Doc. 42), and a proposed second amended complaint, (Doc. 42-1).  In support, plaintiff avers that she received a right to sue notice relating to the supplemental charge of discrimination from the EEOC on August 8, 2024, and obtained the charge file through a Freedom of Information Act request on October 10, 2024. (Doc. 43, Pl. Br. in Supp. at 4).  She seeks to include claims for retaliatory termination now that her administrative remedies have been exhausted.  (Id.)  Substantively, the proposed amended complaint only adds three (3) subparagraphs regarding administrative exhaustion and five (5) paragraphs supplementing plaintiff's claims for retaliatory termination with edits of other averments regarding these issues. (See Doc. 42-2, Prop. Sec. Am. Compl. ¶¶ 2, 6a-6c, 7, 185, 190, 209, 213, 230).

Relying on their arguments in support of the motions to dismiss, City Defendants counter that such amendments would be futile. The Union Defendant, not impacted by the proposed amendment, seeks a ruling on the motions to dismiss to avoid prejudice.   Relative to the motion to amend, plaintiff also filed a separate civil action, Flynn v. City of Scranton, No. 24cv1690 (M.D. Pa), on November 6, 2024.  Per plaintiff, she did so to preserve her claims and protect her interests following administrative exhaustion. (See Doc. 47, J. Menichini Ltr. 11/06/24).  These issues bring the case to its present posture.

**Jurisdiction**

Because many of plaintiff's claims arise under federal law, i.e., the ADA, ADEA, Title VII, and Section 1983, the court has jurisdiction pursuant to 28 U.S.C. § 1331. ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."). The court has supplemental jurisdiction over plaintiff's state employment discrimination and labor law claims pursuant to 28 U.S.C. § 1367(a). ("In any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.").

**Legal Standards**

As noted above, pending are motions to dismiss filed by the defendants and plaintiff's motion to amend. The legal standards relevant to these motions overlap to a certain degree.

Defendants filed their motions pursuant to Federal Rule of Civil Procedure 12(b)(6). The court tests the sufficiency of the amended complaint's allegations when considering a Rule 12(b)(6) motion.

To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim has facial plausibility when factual content is pled that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. Id. (citing Twombly, 550 U.S. at 570). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. (citing Twombly, 550 U.S. at 555).

On a motion to dismiss for failure to state a claim, district courts accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief. See Phillips, 515 F.3d at 233 (citations omitted).

14

Plaintiff also specifically seeks leave to file a second amended complaint. Pursuant to the Federal Rules of Civil Procedure, courts are instructed to "freely give leave [to amend] when justice so requires." FED. R. CIV. P. 15(a)(2). Leave to amend should be given absent any "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment[.]" Foman v. Davis, 371 U.S. 178, 182 (1962). "If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, [she] ought to be afforded an opportunity to test [her] claim on the merits." Id.

City Defendants argue that amendment would be futile. "In assessing futility [of amendment], the district court applies the same standard of legal sufficiency as applies under Rule 12(b)(6)." In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1434 (3d Cir. 1997)(citation and internal quotation marks omitted). Consequently, because of the overlapping legal standards and the union's concerns about prejudice, the court will address all outstanding matters collectively, beginning with the arguments raised by the City Defendants in their motion to dismiss.

**Analysis**

### 1. City Defendants' Motion to Dismiss

City Defendants attack plaintiff's discrimination and retaliation claims on several fronts. First, regarding any claim arising from plaintiff's termination, the city argues that plaintiff did not show up for nine (9) consecutive workdays and thus she abandoned her job.[4] Second, the city argues that the amended complaint fails to set forth plausible ADA, ADEA, Title VII, and PHRA discrimination and retaliation claims. Third, City Defendants contend that two of plaintiff's Section 1983 claims are duplicative. Finally, City Defendants assert that plaintiff failed to state a First Amendment retaliation claim regarding her political speech and association. The court will address these arguments in turn.

### a. Plaintiff's Termination-Related Claims

The first matter to address is the challenge to plaintiff's termination-related averments. Relative to her departure from the city, plaintiff alleges that she received a letter directing her to return to work on September 11, 2023. (Doc. 22, Am. Comp. ¶ 170). Per plaintiff, she planned to be out of town, so she asked to return on September 14 or September 18, 2023. (Id. ¶ 172). Plaintiff, however, has not alleged that she returned on any of the proposed dates or thereafter.

---

[4] The city also argues that plaintiff failed to exhaust her administrative remedies regarding her termination claims. As discussed in section 3, plaintiff seeks leave to amend on this issue.

16

The city then terminated the plaintiff on September 21, 2023. (Id. ¶ 175).

Consequently, the city argues that plaintiff abandoned her job and that her

allegations about retaliatory termination are self-destructive. (See Doc. 41, Def.

Reply Br. at 6-7).  Plaintiff counters that she did not simply abandon her job.

Rather, according to the plaintiff, the amended complaint sufficiently sets forth

the reasons why she did not resume working after the city directed her to return.

On a motion to dismiss, the court measures whether claims are plausible.

Plausible claims exist somewhere between possible claims and probable claims,

that is, "[t]he facts pled must be more than 'merely consistent with a defendant's

liability[,]' "… but, at the same time, "the court need only be able to draw a

'reasonable inference' that the defendant has violated the law." See Martinez v.

UPMC Susquehanna, 986 F.3d 261, 265 (3d Cir. 2021) (quoting Iqbal, 556 U.S.

at 678; Twombly, 550 U.S.at 557)(internal quotation marks omitted).

The end of plaintiff's tenure at the city must be read in context with her

numerous other allegations.  Plaintiff avers that, while on administrative leave,

she indicated that she intended to continue working. (Doc. 22, Am. Compl. ¶

175).  She also made an explicit request "to be considered for a different role"

during that period. (Id. ¶ 173).  Moreover, per plaintiff, her request was covered

by the CBA and plaintiff advised Pikulski and Oleski of her position on the issue

during the meeting preceding her administrative suspension. (Id. ¶¶ 127–28, 163,

176).  The terms of the CBA are not currently before the court.  So plaintiff's allegations that she attempted to assert valid CBA rights during this period must be credited.

Plaintiff also alleges that she received ongoing discriminatory treatment based on her protected traits dating back at least three (3) years prior to her termination.  As discussed in more detail below, this treatment included disagreements over lunch breaks and eating at her desk, which tie back to her disability discrimination and retaliation claims.  Per plaintiff, she also observed younger, non-disabled, and male workers receive far less scrutiny over such things and more favorable treatment overall.  Furthermore, plaintiff alleges that she received unwarranted disciplinary action related to these issues as the calendar turned to 2023.  She also avers that the city was looking for a reason to terminate her once she filed a charge of discrimination with the EEOC in March 2023. (Id. ¶¶ 95, 99, 100–03, 108-18, 120-21, 125, 131–38).  Such efforts included placing plaintiff on the PIP and imposing performance requirements under a new program that was not functional yet. (Id. ¶¶ 129, 140–41, 152–53).

Nonetheless, the city argues that plaintiff's failure to return to work cuts off the causal connection between any protected activity and plaintiff's termination as a matter of law. (See Doc. 22, Def. Br. in Supp. at 8 (citing Weiler v. R&T Mech., Inc., 255 F. App'x 665, 668 (3d Cir. 2007)).  The court disagrees.

As discussed in greater detail below, a plaintiff may rely upon a broad array of evidence to illustrate a causal link for purposes of establishing retaliation or show that certain conduct was used as a basis for employment decisions.  See Farrell v. Planters Lifesavers Co., 206 F.3d 271, 283–84 (3d Cir. 2000).  The city argues as if that full factual record is before the court on their motion to dismiss. It is not.  On the facts pled, plaintiff sets forth a plausible scenario where her protected traits and protected activity allegedly led to her termination based on the cumulative, cascading nature of the events described in the amended complaint.    Accordingly, the City Defendants' motion to dismiss plaintiff's termination-related averments will be denied.

### b. Plaintiff's ADA, ADEA, Title VII, and PHRA Discrimination and Retaliation Claims

The city also challenges the plausibility of plaintiff's ADA, ADEA, Title VII, and PHRA claims in an overarching manner.[5]  Plaintiff proceeds against the city asserting pretext theories of employment discrimination and retaliation, i.e., she believes she possesses circumstantial proof of such conduct. (See Doc. 22, Am. Compl. ¶¶ 177, 184, 193, 214, 230).    Where there is no direct evidence of

---

[5] Claims under the ADA, ADEA, and Title VII all generally align. Fowler v. AT&T, Inc., 19 F.4th 292, 298 (3d Cir. 2021). And interpretation of the PHRA is identical to that of its federal analogues. See Morgan v. Allison Crane & Rigging LLC, 114 F.4th 214, 220 & n. 21 (3d Cir. 2024); Willis v. UPMC Children's Hosp. of Pittsburgh, 808 F.3d 638, 644 (3d Cir. 2015)(citations omitted).  The court will thus address the city's arguments on its motion to dismiss plaintiff's discrimination, hostile work environment, and retaliation claims in combined analyses while noting any nuances of such claims under the law.

discrimination or retaliation, claims arising under various anti-discrimination statutes are reviewed pursuant to the framework set forth in McDonnell Douglas v. Green, 411 U.S. 792 (1973). See Canada v. Samuel Grossi & Sons, Inc., 49 F.4th 340, 346 (3d Cir. 2022)(addressing Title VII and ADA retaliation claims together); Fowler, 19 F.4th at 298 (addressing ADA and ADEA discrimination claims together).

### i.   Discrimination Claims

As for plaintiff's age, disability, and gender discrimination claims, the McDonnell Douglas framework involves burden shifting and a plaintiff must first establish *prima facie* cases for each claim with tailored elements depending on the protected trait or the type of discrimination alleged. "[T]here is a low bar for establishing a *prima facie* case of employment discrimination." Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ., 470 F.3d 535, 539 (3d Cir. 2006). "Under the McDonnell-Douglas framework, a claim of employment discrimination necessarily survives a motion to dismiss so long as the requisite *prima facie* elements have been established…because 'it may be difficult' for a plaintiff to prove discrimination '[b]efore discovery has unearthed relevant facts and evidence.' " Castleberry v. STI Grp., 863 F.3d 259, 266 (3d Cir. 2017) (quoting Swierkiewicz v. Sorema N.A., 534 U.S. 506, 512 (2002)). Thus, to survive a motion to dismiss, a complaint need only allege enough facts to raise a

reasonable expectation that discovery will reveal evidence of the necessary

elements. Connelly v. Lane Constr. Corp., 809 F.3d 780, 789 (3d Cir.

2016)(citations and quotation marks omitted).  Other district courts in this circuit

have described such a pleading standard as deferential.  Doe v. Triangle

Doughnuts, LLC, 472 F. Supp. 3d 115, 126 (E.D. Pa. 2020).

The *prima facie* case differs only slightly across plaintiff's employment

discrimination claims.  The plaintiff must show that she was (1) disabled (for the

ADA claim), over the age of 40 (for the ADEA claim), or a member of a protected

class (for the Title VI claim); (2) subject to an adverse employment action; and

(3) qualified for her position. Fowler, 19 F.4th at 299 (citations omitted); Burton v.

Teleflex Inc., 707 F.3d 417, 426 (3d Cir. 2013)(citations omitted).  The fourth

element of a *prima facie* case may be met by demonstrating that "the 'adverse

employment action occurred under circumstances that could give rise to an

inference of intentional discrimination.' " Burton, 707 F.3d at 426 (quoting Makky

v. Chertoff, 541 F.3d 205, 214 (3d Cir. 2008)).

Moreover, "the precise requirements of a *prima facie* case can vary

depending on the context and were 'never intended to be rigid, mechanized, or

ritualistic.' " Swierkiewicz, 534 U.S. at 512 (citing Furnco Constr. Corp. v. Waters,

438 U.S. 567, 577 (1978)).  For age discrimination claims, the fourth element

could take the form of the plaintiff being "replaced by another employee who was

21

sufficiently younger so as to support an inference of discriminatory motive."
Willis, 808 F.3d at 644 (citing Burton, 707 F.3d at 426).  "Where the plaintiff is not
directly replaced, the fourth element is satisfied if the plaintiff can provide facts
which 'if otherwise unexplained, are more likely than not based on the
consideration of impermissible factors.' " Id. (quoting Pivirotto v. Innovative Sys.,
Inc., 191 F.3d 344, 357 (3d Cir. 1999)(further citation omitted).

    The city argues that plaintiff cannot demonstrate age discrimination
because she has failed to allege facts that she was replaced by a younger
employee. (Doc. 27, Def. Br. in Supp. at 10).  Under the law, however, she need
not make that specific allegation to proceed.  Instead, plaintiff presents other
allegations supporting an inference of intentional discrimination based on age.
For example, plaintiff alleges that her duties and responsibilities in the LIPD are
now performed by younger employees. (Doc. 22, Am. Compl, ¶ 185).  She also
avers that the city learned the plaintiff was not going to retire in 2022 and then
hired a substantially younger employee in 2023 to perform the same or similar
duties and supervise plaintiff one-on-one. (Id. ¶¶ 75, 77, 93–95).  Per plaintiff,
other younger employees were not subject to such scrutiny of their work or
subject to the same overall treatment, including discipline for small infractions
and threats from supervisors of more discipline. (Id. ¶¶ 106, 113–15).  Plaintiff
has thus pled specific facts alleging that she was treated differently by the city

based on her age and that the city transitioned her duties to younger workers as it set plaintiff on a course toward termination in lieu of her retirement. Such allegations demonstrate a plausible age discrimination claim.

To state a claim for disability discrimination, a plaintiff must demonstrate: (1) she is a disabled person within the meaning of the ADA; (2) she is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) she has suffered an otherwise adverse employment decision as a result of discrimination. Eshleman v. Patrick Indus., Inc., 961 F.3d 242, 245 (3d Cir. 2020)(citation omitted).

The city challenges plaintiff's averments relative to the alleged scrutiny she faced regarding her lunch breaks and eating at her desk, arguing that such allegations are insufficient. Per the amended complaint, however, plaintiff was required to eat multiple small meals each day at her desk following gastric bypass surgery. (Doc. 22, Am. Compl. ¶¶ 39–42). Despite accommodation from the city, plaintiff alleges that she received criticism for using this accommodation and the time when she took a lunch break. (Id. ¶¶ 42–44). In November 2022, plaintiff was directed to take her lunch period by 1:00 PM. (Id. ¶ 81). In June 2023, plaintiff received correspondence regarding her final warning and placement on the PIP. (Id. ¶¶ 129, 132). The correspondence cited "unfounded and unfairly scrutinizing complaints" about what plaintiff did during her lunch

break. (Id. ¶ 132).  According to plaintiff, other non-disabled employees did not receive the same level of scrutiny with respect to where and when they ate their lunch and were not reprimanded or threatened with termination for similar behavior. (Id. ¶¶ 44, 133, 204).  Essentially, plaintiff alleges that the city paid lip service to the ADA and that, overall, she was treated differently by the city based on her disability.  Similar to her age discrimination claim, plaintiff also avers that, after her termination, the city transitioned her duties to non-disabled workers who did not need reasonable accommodations. (Id. ¶ 207).  Such allegations likewise demonstrate a plausible disability discrimination claim.

The city also challenges plaintiff's *prima facie* gender discrimination case. But here plaintiff also includes sufficient allegations to state a plausible claim. For example, the city hired a male worker to fill an open rental registration position after plaintiff complained to the defendants that she was also performing the duties of that role. (Id. ¶¶ 45–49, 62–63).  Initially, that male worker performed rental registration tasks with plaintiff assisting and processing the mail. (Id. ¶ 64).  But shortly after his hire, Oleski, their mutual male supervisor, determined that the new male employee was required to inspect properties, returning the rental registration tasks to the plaintiff. (Id. ¶¶ 65–67).  Per plaintiff, Oleski's decision to remove this new male employee from those duties was a deviation from the past practice of the employee previously in that role. (Id. ¶ 71).

24

Additionally, plaintiff's amended complaint contains numerous allegations that Oleski unfairly scrutinized the plaintiff's work, imposed arbitrary work requirements, gave plaintiff contrary instructions about time-off requests that led to discipline, and attended the plaintiff's PIP meeting to continue persecuting the plaintiff. (Id. ¶¶ 57, 78, 87, 90–91, 151).  Per plaintiff, a question from Oleski at the PIP meeting triggered the city in acting to discipline the plaintiff further, that is, she was placed on an administrative suspension. (Id. ¶¶ 155–166).  Plaintiff has thus identified a male comparator treated more favorably by a male supervisor.  She has also averred that this male supervisor treated her differently based on age, disability, *and* gender.  Accordingly, the city's motion to dismiss plaintiff's gender discrimination claims will be denied.

### ii.    Hostile Work Environment Claims

Based on Oleski's alleged treatment of the plaintiff, she also asserts a hostile work environment theory of discrimination in violation of the ADA, ADEA, Title VII and the PHRA. (*Id.* ¶¶ 181, 191, 193, 206, 208, 214, 220, 228, 230, 232). The city likewise moves to dismiss any allegations related to a hostile work environment.  To succeed such a claim pursuant to these statutes, the plaintiff must establish that: 1) the employee suffered intentional discrimination because of her disability (for an ADA claim), age (for an ADEA claim), or sex (for a Title VII claim); 2) the discrimination was severe or pervasive; 3) the discrimination

detrimentally affected the plaintiff; 4) the discrimination would detrimentally affect a reasonable person in like circumstances; and 5) the existence of *respondeat superior* liability. Mandel v. M & Q Packaging Corp., 706 F.3d 157, 167 (3d Cir. 2013)(citation omitted)(Title VII); Walton v. Mental Health Ass'n. of Se. Pennsylvania, 168 F.3d 661, 666 (3d Cir. 1999)(ADA); see also Howell v. Millersville Univ. of Pennsylvania, 749 F. App'x 130, 135 (3d Cir. 2018) (assuming without deciding that the ADEA permits hostile work environment claims); Culler v. Sec'y of U.S. Veterans Affs., 507 F. App'x 246, 249 & n. 3 (3d Cir. 2012)(assuming without deciding that hostile work environment analyses are the same under the ADEA as under Title VII).

The city argues that the amended complaint fails to allege that the work-environment was so pervaded with mistreatment based on the plaintiff's protected traits. Nonetheless, "[w]hether an environment is hostile requires looking at the totality of the circumstances, including: 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.' " Castleberry, 863 F.3d at 264 (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 22 (1993)). The court cannot appreciate the totality of the circumstances at this stage of the litigation. Moreover, on the facts of her pleading detailed above, plaintiff has advanced more than the

required detail to move forward.  Thus, the city's motion to dismiss plaintiff's hostile work environment claims will be denied.

### iii.  Retaliation Claims

The city also moves to dismiss plaintiff's retaliation claims.  As with her age, disability, and gender discrimination claims, the circumstances of plaintiff's retaliation claims do not require substantially different analyses at this time. See Daniels v. Sch. Dist. of Philadelphia, 776 F.3d 181, 192 (3d Cir. 2015)(analyzing ADEA, Title VII, and PHRA retaliation claims together); Krouse v. Am. Sterilizer Co., 126 F.3d 494, 500 (3d Cir. 1997)(analyzing an ADA retaliation claims under the same framework employed under Title VII).  *Prima facie* retaliation claims require a showing that: 1) the plaintiff engaged in protected employee activity; (2) she experienced adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection exists between the employee's protected activity and the employer's adverse action. See Daniels, 776 F.3d at 193 (citations omitted).  The requisite causal connection can be established through: (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action; (2) a pattern of antagonism coupled with timing to establish a causal link; or (3) an inference of causation from evidence gleaned from the record as a whole. See Lauren W. ex rel. Jean W. v. DeFlaminis, 480 F.3d 259, 267 (3d Cir.

2007)(citing <u>Krouse</u>, 126 F.3d at 503–04; <u>Woodson v. Scott Paper Co.</u>, 109 F.3d 913, 920–21 (3d Cir. 1997); <u>Farrell</u>, 206 F.3d at 281).

As for plaintiff's ADA retaliation claim, the city focuses on allegations that plaintiff received an accommodation from the city to eat at her desk several years before her termination.  Per the city, such a gap in time between an accommodation request and adverse employment action defeats plaintiff's claim.

According to the amended complaint, however, plaintiff transferred into the LIPD from another city department in 2020 after already having been provided the accommodation of eating at her desk. (<u>See</u> Doc. 22, Am. Compl. ¶¶ 32–34, 39–43).  Nonetheless, per plaintiff, she continued to be criticized for using that accommodation and scrutinized over the details of her lunch breaks. (<u>Id.</u>)  Such criticism and scrutiny about plaintiff's use of her accommodation made their way into plaintiff's complaints to the city and her labor union about unfair treatment. (<u>Id.</u> ¶¶ 87, 102–107, 115, 118, 205).  Plaintiff later took these previously internal complaints to the EEOC by filing a charge of discrimination. (<u>Id.</u> ¶¶ 116, 206). Plaintiff also alleges that she then received harsher treatment, closer scrutiny of her work, and escalating discipline from the city after she began levying complaints, which culminated in administrative suspension and termination while her EEOC charge remained pending. (<u>Id.</u> ¶¶ 58-62, 78, 88–100, 108–118, 120– 121, 125–175).  With these facts, plaintiff has demonstrated a *prima facie* ADA

retaliation claim, that is, she has averred protected activity, adverse action, and a pattern of antagonism with timing to connect the protected activity to the adverse actions.

The plaintiff's gender-based retaliation claim follows the same course simply by substituting in plaintiff's allegations relative to her complaints about the more favorable treatment received by plaintiff's younger, male coworker in the rental registration department by their male supervisor as detailed above. Add in plaintiff's allegations about younger workers not being disciplined for infractions as plaintiff experienced or not being subject to the same level of scrutiny during working (and nonworking) hours as plaintiff and the amended complaint sufficiently alleges claims for age-related retaliation. Thus, the City Defendants' motion to dismiss plaintiff's ADA, ADEA, Title VII, and PHRA retaliation claims will be denied.

### c. Plaintiff's Union Membership and Union Activity Claims

Moving on to plaintiff's Section 1983 claims, plaintiff also alleges that she experienced retaliation for exercise of her First Amendment rights. Count IV of the amended complaint asserts that the City Defendants retaliated against the plaintiff for her union membership. Count V claims that the City Defendants retaliated against the plaintiff for her union activity. City Defendants argue that such claims are duplicative of each other and thus they should be merged with

Count V being dismissed. Plaintiff counters that she has asserted one claim based on her union association and one based on union-related speech. (See Doc. 37, Pl. Br. in Supp. at 33).

"[W]here a public employee asserts retaliation in violation of the First Amendment as a free speech claim and a pure union association claim, those claims must be analyzed separately[.]" Baloga v. Pittston Area Sch. Dist., 927 F.3d 742, 748–49 (3d Cir. 2019)(citing Palardy v. Twp. of Millburn, 906 F.3d 76, 81 (3d Cir. 2018)); see also Rivers v. Borough of Olyphant, No. 3:20-CV-246, 2021 WL 2682048, at *3 (M.D. Pa. June 30, 2021)(Conner, J.). On the other hand, the allegations in Counts IV and V contain overlapping allegations relative to plaintiff's union association and union-related speech. (See Doc. 22, Am. Compl. ¶¶ 237, 239-241, 247–252). If plaintiff's union membership claim in Count IV seeks to advance a pure association claim, plaintiff has also sprinkled in allegations that she was a "vocal member" of the union and that she experienced retaliation because she exercised her free speech rights. (Id. at 237, 239–241).

Under any scenario, this case would move forward with a separate analysis of the plaintiff's free speech and free association claims. See Otero v. Port Auth. of New York & New Jersey, No. CV141655ESJSA, 2021 WL 3879092, at *7 (D.N.J. Aug. 30, 2021), aff'd, No. 21-2772, 2022 WL 2826440 (3d Cir. July 20,

2022)(separately addressing speech and association claims pled in the same causes of action). Thus, the court will not dismiss Count V as requested by the City Defendants. Plaintiff, however, may provide clarity as to her union association and union-related speech claims in a second amended complaint as plaintiff has requested.

### d. Plaintiff's Political Association and Speech Claims

Plaintiff's third distinct Section 1983 claim against the City Defendants (Count VI) alleges that she experienced retaliation for her political association and speech in violation of her First Amendment rights. Plaintiff avers that she has a specific political association with her son, State Senator Flynn, who is also alleged to be a vocal critic of Defendant Cognetti. (Doc. 22, Am. Compl. ¶¶ 23–24). Plaintiff further alleges that she had a specific political association with Chris Cullen as mayoral candidate in Scranton's 2019 election. (Id. ¶¶ 26, 262). Connected to the association with Cullen, plaintiff avers that she is associated with the Lackawanna County Democratic Committee, which did not support Defendant Cognetti when she ran against Cullen. (Id. ¶ 28). Plaintiff alleges that Defendant Cognetti knew that State Senator Flynn and the plaintiff supported a different mayoral candidate. (Id. ¶ 29). She avers that City Defendants terminated her for associating with and supporting State Senator Flynn, Cullen, and the Lackawanna County Democratic Committee. (Id. ¶¶ 271–73).

31

"The First Amendment generally prohibits government officials from dismissing…an employee because of the employee's engagement in constitutionally protected political activity." Heffernan v. City of Paterson, N.J., 578 U.S. 266, 268 (2016)(citing Elrod v. Burns, 427 U.S. 347 (1976); Branti v. Finkel, 445 U.S. 507 (1980)) (further citation omitted).  To prevail on a First Amendment retaliation claim, a plaintiff must prove that: 1) she engaged in constitutionally protected conduct; 2) the defendant engaged in retaliatory action sufficient to deter a person of ordinary firmness from exercising his constitutional rights; and 3) a causal link existed between the constitutionally protected conduct and the retaliatory action.  Baloga, 927 F.3d at 752 (citing Palardy, 906 F.3d at 80–81; Thomas v. Indep. Twp., 463 F.3d 285, 296 (3d Cir. 2006)(quotation marks and brackets removed)).

In moving to dismiss plaintiff's political association and speech claim, the City Defendants assert that the allegations in the complaint are insufficient to establish a causal connection between plaintiff's exercise of her First Amendment rights and the adverse employment action.  City Defendants focus on the gap in time between the 2019 mayoral election and the time plaintiff alleges that she first received formal discipline, February 2022.

After considering all of the plaintiff's allegations, however, the 2019 mayoral election simply provides the backdrop for additional adverse events that occurred

32

after Defendant Cognetti was elected and the plaintiff continued to provide political support to others, including her son. For example, plaintiff alleges that she received escalating discipline at work beginning in November 2022 after her son's reelection to the State Senate. In the context of those events, Defendant Cognetti also allegedly spoke with State Senator Flynn by telephone at some point in 2023 and stated, "can't you just get your mom a state job and get her out of the [c]ity." (Doc. 22, Am. Compl. ¶¶ 273–74). By the fall of 2023, plaintiff was terminated. These allegations set forth a pattern of antagonism coupled with timing to establish a causal link as with the plaintiff's other retaliation claims. Thus, the City Defendants' motion to dismiss plaintiff's political association and speech claim will be denied.

### 2. Union Defendant's Motion to Dismiss

Having addressed the City Defendants' arguments to dismiss, the court turns next to plaintiff's claim against Union Defendant for breach of its duty of fair representation in Count VII of the amended complaint. Union Defendant argues that the claim is legally deficient.

"A union is guilty of unfairly representing an employee if its refusal to carry a grievance through to arbitration is due to arbitrariness, discrimination or bad faith." Fouts v. Allegheny Cnty.,440 A.2d 698, 701 (Pa. Commw. Ct. 1982)(citing Vaca v. Sipes, 386 U.S. 171 (1968); Pa. Lab. Rels. Bd. v. Eastern Lancaster

Cnty. Educ. Ass'n., 427 A.2d 305 (Pa. Commw. Ct. 1981)). "[A] union's actions are arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a 'wide range of reasonableness,'…as to be irrational." Air Line Pilots Ass'n, Int'l v. O'Neill, 499 U.S. 65, 67 (1991)(citation omitted). "Nevertheless, it remains well established that a union must 'serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct.' " Danao v. ABM Janitorial Servs., 142 F. Supp. 3d 363, 372 (E.D. Pa. 2015)(quoting Marquez v. Screen Actors Guild, Inc., 525 U.S. 33, 44 (1998)). A union's good faith representation "must be vigorous enough so that available opportunities to present the grievance are utilized, and sufficiently thorough so that the basic issues are presented in an understandable fashion." Findley v. Jones Motor Freight, Div. Allegheny Corp., 639 F.2d 953, 961 (3d Cir. 1981).

Union Defendant argues that its actions were not arbitrary, discriminatory, or in bad faith. The court notes, however, that it does not have the entire factual landscape to review the Union Defendant's actions under the above standard. Rather, the court must assume that the picture painted by the plaintiff reflects what happened. Plaintiff alleges that, after a due process hearing in January 2023, she was suspended without pay and prohibited from bidding on other

34

clerical positions in violation of the CBA. (Doc. 22, Am. Compl. ¶¶ 96-100). Union Defendant grieved the inability to bid into a new position and presented that issue in arbitration, but not the plaintiff's unpaid suspension itself, or any of the other work discipline that she received from the city. (Id. ¶¶ 107, 118, 127).

Plaintiff also alleges that other negative things occurred around that time that were not taken up by the Union Defendant. For example, the city moved a unionized rental registration employee into duties inspecting properties at some point in 2022 after not filling that position for some time. (Id. ¶¶ 46–48, 66). Then, per plaintiff, the city created a non-union rental registration position and filled that position in January 2023 with an employee effectively reviewing all of plaintiff's tasks. (Id. ¶¶ 93–95, 106). Essentially, plaintiff avers that the city created a $50,000 non-union position to review all of plaintiff's work and then ultimately that employee filled the plaintiff's shoes at the city after it fired the plaintiff. (Id. ¶¶ 106, 119). Plaintiff alleges that the Union Defendant did nothing to redress those issues with the city despite plaintiff's repeated complaints to the union's business agent. (Id. ¶ 296). Plaintiff's allegations thus make a plausible claim against the Union Defendant for breach of the duty of fair representation.[6]

---

[6] Separately, Union Defendant argues that plaintiff's complaints about its failure to act before January 12, 2022 should be dismissed from the amended complaint since the statute of limitations period for a duty of fair representation claim is two years. (Doc. 28, Br. in Supp. at 16 (citing Casner v. Am. Fed'n of State, Cnty. & Mun. Emps., 658 A.2d 865, 870 (Pa. Commw. Ct. 1995)). Plaintiff concurs that the statute of limitations is two years. (Doc. 36, Br. in Opp. at 27). The amended complaint, however, is not a model of clarity as to when plaintiff first

### 3. Plaintiff's Motion to Amend

Having addressed the defendants' arguments in their motions to dismiss above, plaintiff's motion for leave to file a second amended complaint will be granted. As discussed in section 1a, plaintiff's averments state claims for discriminatory and retaliatory termination. Thus, these claims are not futile. The Union Defendant argues that amendment would be prejudicial. (Doc. 45, Br. in Opp. at 5). But the union's concerns relate to delaying the ruling regarding the motions to dismiss. Having addressed the defendants' motions in this memorandum, those prejudice concerns are allayed.

Nonetheless, based on the above rulings regarding plaintiff's free speech and free association claims in Counts IV and V, the court cannot direct the Clerk of Court to docket the plaintiff's proposed second amended complaint as the operative pleading. Instead, plaintiff may file a second amended complaint as she proposes with additional amendments addressing those causes.

---

brought her issues in the rental registration department to the attention of the union. One of the first issues identified in plaintiff's timeline is when she complained about the city not filling the other unionized rental registration position. (Doc. 22, Am. Compl. ¶¶ 45–48). A fair reading of plaintiff's amended complaint suggests that this issue may have come up after plaintiff received a verbal warning for alleged time clock violations in February 2022, which would be within the agreed-upon limitations period. (See id. ¶ 58). The appropriate course is to revisit this issue after discovery.

### 4. Consolidation

Finally, while the above motions were pending, plaintiff filed a separate civil action, Flynn v. City of Scranton, No. 24cv1916 (M.D. Pa). The complaint in that matter includes three causes of action mirroring Counts I-III in this action. (No. 24cv1916, Doc. 1, Compl.). Per plaintiff, she filed the second action to assert claims based upon the supplemental charge of discrimination, i.e., the matters related to plaintiff's termination from the city without those claims becoming time-barred. (Id. ¶ 15). The actions in both cases involve common questions of law and fact. Thus, pursuant to the discretion afforded by Federal Rule of Civil Procedure 42(a), the court will consolidate the actions. See Ellerman Lines, Ltd. v. Atl. & Gulf Stevedores, Inc., 339 F.2d 673, 675 (3d Cir. 1964)(Rule 42(a) "confers upon a district court broad power, whether at the request of a party or upon its own initiative, to consolidate causes for trial as may facilitate the administration of justice."). When filed, the second amended complaint will act as the operative pleading in the consolidated matters.

### Conclusion

For the reasons set forth above, the City Defendants' motion to dismiss will be denied. Plaintiff, however, may file a second amended complaint more clearly pleading her free association claim regarding her union membership. The Union Defendant's motion to dismiss will be denied. Plaintiff's motion for leave to file a

second amended complaint will be granted.  Additionally, this action will be

consolidated with the action at <u>Flynn v. City of Scranton</u>, No. 24cv1916 (M.D. Pa)

and the Clerk of Court will be directed to close the later-filed case.  An

appropriate order follows.

**Date:** 11/20/24

JUDGE JULIA K. MUNLEY
United States District Court